Filed 8/7/15  Modified and Cert. for Partial Pub. 8/24/15 (order attached)

# IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FOURTH APPELLATE DISTRICT

## DIVISION TWO

| | |
|---|---|
| In re K.B. et al., Persons Coming Under the Juvenile Court Law. | |
| RIVERSIDE COUNTY DEPARTMENT OF PUBLIC SOCIAL SERVICES, | E061803 |
| Plaintiff and Respondent, | (Super.Ct.No. RIJ1400250) |
| v. | OPINION |
| K.B., | |
| Defendant and Appellant. | |

APPEAL from the Superior Court of Riverside County.  Tamara L. Wagner,

Temporary Judge.  (Pursuant to Cal. Const., art. VI, § 21.)  Affirmed.

Stephanie M. Davis, under appointment by the Court of Appeal, for Defendant and

Appellant.

Gregory P. Priamos, County Counsel, and Julie Koons Jarvi, Deputy County

Counsel, for Plaintiff and Respondent.

1

Roni Keller, under appointment by the Court of Appeal, for Respondent K.D.[1]

Defendant and appellant K.B. (mother) appeals from the trial court's order placing her youngest son, X.B., with his nonoffending and noncustodial biological father, K.D. (father), who lives out of state. She argues that the court erred by failing to find under Welfare and Institutions Code section 361.2, subdivision (a),[2] that it would be detrimental to X.B.'s emotional well-being to be separated from his maternal family. Mother requests that X.B. be placed with his older sibling, K.B., in the home of his maternal grandmother. She also argues that the court failed to give proper notice under the Indian Child Welfare Act (ICWA). We affirm the judgment.

I

FACTUAL AND PROCEDURAL BACKGROUND

A. *Detention and Jurisdiction*

Six-year-old X.B. and his 12-year-old brother, K.B., have different fathers. Prior to detention, the boys lived with mother and her boyfriend in Riverside. The boys came to the attention of the Riverside County Department of Public Social Services (the Department) after it was reported that mother had been physically abusing K.B. The

---

[1] At the recommendation of plaintiff and respondent Riverside County Department of Public Social Services and by order of this court dated March 4, 2015, we directed Appellate Defenders, Inc. to appoint counsel for respondent father K.D. Father subsequently filed a respondent's brief.

[2] All further statutory references are to this code unless otherwise indicated.

Department placed the boys in the home of the maternal grandmother, who also lives in Riverside.

The dependency petition alleged that mother had beat K.B. with a belt causing welts and bruises to his chest, shoulder, arms, and legs, and that she pushed K.B.'s head into a pillow to muffle his screams, causing him to feel as if he were suffocating. The petition alleged that mother had a history of using inappropriate discipline techniques on the boys, such as beating them with belts, humiliating K.B. in public, and forcing K.B. to complete strenuous exercise routines as punishment. It also alleged that mother allowed her live-in boyfriend to inappropriately punish K.B. and to smoke marijuana in the children's presence.

During the course of its investigation, the Department learned that X.B. was in contact with his biological father, K.D., who was in the Air Force and stationed in Italy. X.B. told the social worker that he talked to father through social media and by telephone. The social worker interviewed father over the telephone while he was in Italy. Father was a staff sergeant. He had joined the Air Force immediately after graduating from high school and had served there for the past 15 years. During his 15-year service, father had worked as a medic and had completed college courses. He planned to retire in the next few months. He did not have a substance abuse or criminal history. He paid mother $748 a month in child support for X.B. He reported that he had phone calls and

Face Time/Skype sessions with the boys. He had no idea that mother had been physically abusing them or that her boyfriend was smoking marijuana in their presence.

Father expressed a desire to become a bigger part of X.B.'s life and was strongly considering shared custody. He participated in the development and implementation of the case plan. He called the boys at the maternal grandmother's home twice a week to check on them. The maternal grandmother warned him not to split the boys up by seeking full custody of X.B.

At the jurisdiction hearing on April 28, 2014, mother submitted on the petition and waived her right to trial. The court sustained the allegations against mother. It found that K.B. was a dependent of the juvenile court under section 300, subdivisions (a), (b), and (g), and that X.B. was a dependent under section 300, subdivisions (b) and (j). It also found that father was a nonoffending parent. Father requested that X.B. be placed with him, and the trial court ordered the Department to file an addendum report regarding placement with father.

On May 12, 2014, the social worker spoke with father and his wife, who is also in the Air Force. The couple was happy to hear that the court was considering placing X.B. with them. They were raising two children together, and X.B. was welcome to be a part of their family. They had a room ready for X.B. in their home in Springfield, Virginia. Father would be stationed out of the United States until June 2014. His plan was to retire so that he could spend more time with his children, including X.B. He suggested that

4

X.B. might be transitioned to their home through visitation so that he could get to know his father and acclimate to their home environment and parenting style.

X.B. reported to the social worker that he liked talking with his father and wanted to speak with him every day. His first preference was to return to mother's home, but if he could not live with her, he wanted to try living with father.

On May 19, 2014, the court ordered unsupervised visitation for father with X.B. and K.B., including via the Internet through Skype/Face Time. On June 17, 2014, father returned to the United States from active duty in Italy. The social worker went on vacation from June 20 to 30, and did not speak with father until July 2. In an addendum report, the social worker stated that father "declined visitation with his son at this time." He reported that father told him he needed to "create a healthy environment for [X.B.]" by "working on his marriage" and obtaining employment with his brother's company. The Department recommended that the boys remain placed with the maternal grandmother and that mother and father be given reunification services.

1. *Disposition*

At the disposition hearing on July 16, 2014, the court heard testimony on the issue of whether X.B. would suffer detriment under section 361.2, subdivision (a), if he were placed with father. Father testified that he wanted X.B. placed with him and that he had been consistent in wanting placement. He explained that he was currently separated from his wife, but they were working on their marriage. During the separation, he lived with

5

his parents in Greensboro, North Carolina, and visited his wife and their children in Springfield, Virginia on the weekends. He and his wife have one child together, a four-year-old girl. His wife also has an 11-year-old son who calls father "Dad."

Father testified that he was ready to take on the role of X.B.'s full-time father. Whether he reconciled with his wife or not, he had a stable place for X.B. to live. The home he shared with his wife in Springfield had already been positively evaluated for placement by X.B.'s investigator. There was a room in father's parents' house for X.B., and there was an elementary school nearby in Greensboro that X.B. could attend. He and X.B. could live with the paternal grandparents indefinitely, until they were ready to move back to Springfield or elsewhere. Father was looking for a job, but in the meantime he was receiving an income through Air Force retirement benefits.

Father recognized the importance of X.B. being able to keep in touch with his maternal family. He testified that he would take X.B. on trips to California so that X.B. could visit the maternal family. X.B. would have counseling services available to him if needed because father had access to military services as a retiree.

In response to the social worker's statements in the addendum report, father was questioned about the sincerity of his desire to have X.B. placed with him. Father testified that he had never told the social worker that he did not want X.B. placed with him. He explained that he had simply informed the social worker of his current situation, which was that he had just returned from Italy, was separated from his wife, and was looking for

a new job. The social worker was incorrect in assuming this information meant he did not want X.B. placed with him immediately.

The social worker testified that he was not aware of anything regarding father's home or background that presented a reason why X.B. could not be placed with him. His concern about placing X.B. with father immediately was that he understood from recent conversation with father that father was trying to sort through turmoil in his life. The social worker testified that he knew X.B. was looking forward to seeing his father. He recommended holding off on placement and ordering an extended visit to assess the relationship between father and X.B.

At the close of the hearing, the court found that father was adamant about wanting visitation and wanting immediate placement. It stated that the only potential detrimental factor in placing X.B. with father would be emotional. It ordered an immediate extended visit with father and continued the disposition hearing to August 13, 2014, so that it could assess the visit and determine if placement with father was appropriate at that time.

X.B.'s investigator, the chief investigator for the Juvenile Defense Panel, submitted a report dated August 10, 2014. On July 12, 2014, before the disposition hearing, the investigator had evaluated the home of father and his wife on July 12 and had found it to be safe and appropriate. He had also interviewed father's wife that day. She is an active member of the Air Force. She has been married to father for five years and they are working on their marriage. Father had several job leads. She was very

excited to have X.B. live with them, but she was also frustrated with the way they had been treated by the Department.

The investigator spoke with father the next day, July 13. He asked father if he had ever told anyone from the Department that he was not ready to have X.B. placed with him. Father "emphatically" replied that he had not. Father said that he had told the social worker about the difficulties he was having with his marriage and finding employment. However, he believed that he communicated to the social worker that, despite these issues, he did want X.B. placed with him. Based on his conversations with father and his wife and his evaluation of the home, the investigator concluded that he "saw no reason why the minor should not be placed in the home."

On August 8, the investigator arrived at father's parents' home in Greensboro, North Carolina to assess the extended visit. The investigator observed that X.B. "is obviously bonded to his dad and [his paternal] grandmother." X.B. told the investigator that he loves his dad and really likes being with him. He also likes father's wife and his stepsibling. He reported that he has a lot of fun with them and is well cared for.

The investigator's sole concern was that the maternal grandmother was attempting to influence X.B.'s feelings about placement. Father was allowing X.B. to talk to her whenever she called and was allowing X.B. to call her whenever he wanted. X.B. told the investigator that every time he spoke with the maternal grandmother, she told him that she misses him and "will be very sad if he does not come home." He also told the

8

investigator that he loves his dad but does not want to disappoint his grandmother. The investigator concluded his report by observing that he "found no problem with the home or the minor" and that he "saw genuine affection between [X.B.] and his dad."

At the continued disposition hearing, the Department recommended that both parents receive reunification services, and X.B.'s counsel recommended that X.B. be placed with father. Mother's counsel stated that mother wants X.B. to remain with the maternal grandmother, and she added, "but I have explained everything to [mother], in that there's really—there's really not a whole lot that this Court can do at this point."

The court stated that it had read the investigator's report and "by all accounts, everything went very well." The court chastised the maternal grandmother for disobeying court orders and inappropriately attempting to influence X.B. regarding placement. It stated that father was a nonoffending parent under section 361.2, subdivision (a), and found that placement with father "would not be detrimental to the safety, protection, physical, or emotional well-being of the child." The court removed X.B. from mother and granted father sole physical and legal custody of the child. The court granted mother supervised visitation.[3]

---

[3] As to K.B., the court removed the child from mother and gave her reunification services.

9

On August 28, 2014, the court issued the final custody order as to X.B. and terminated jurisdiction.

ANALYSIS

A. *Substantial Evidence Supports the Court's Dispositional Order*

Mother argues that the court erred in finding that placing X.B. with father was not detrimental to X.B.'s emotional well-being under section 361.2, subdivision (a). The Department submits on the issue of whether the court erred in placing X.B. with father and terminating the dependency. Based on our review of the record, we conclude that substantial evidence supports the court's finding.

When a court orders removal of a child pursuant to section 361, the court must first determine whether there is a noncustodial parent "who desires to assume custody of the child," and if so, "the court *shall* place the child with the parent *unless* it finds that placement with that parent would be detrimental to the safety, protection, or physical or emotional well-being of the child." (§ 361.2, subd. (a), italics added.) Section 361.2 "evidences 'the Legislative preference for placement with [the noncustodial] parent.' " (*In re John M.* (2006) 141 Cal.App.4th 1564, 1569.) It is the burden of the party or parties opposed to such placement to prove detriment by "clear and convincing evidence." (See *id.* at pp. 1569, 1571.)

We review a court's dispositional order for substantial evidence. (*In re T.V.* (2013) 217 Cal.App.4th 126, 136.) "Our role in considering an insufficiency of the evidence claim is quite limited. We do not reassess the credibility of witnesses [citations], and we review the record in the light most favorable to the findings of the juvenile court [citations], drawing all inferences from the evidence which support the court's determination." (*In re Nada R.* (2001) 89 Cal.App.4th 1166, 1177.) Our task is to determine "whether evidence of reasonable, credible and solid value exists such that a reasonable trier of fact could find as the trial court did." (*Ibid.*) Thus, in order to succeed on appeal, mother must demonstrate that there is no evidence of a sufficiently substantial nature to support the court's order. (*In re Lana S.* (2012) 207 Cal.App.4th 94, 103.)

Mother cannot meet that burden on appeal because the record contains evidence that father strongly desired X.B. to be placed with him, was able to provide a safe, healthy, and happy home for X.B., and that X.B. enjoyed being with his father and his father's family. When the investigator assessed X.B. during the extended visit with father, the investigator found X.B. to be happy, well cared for, and to have "genuine affection" for father.

Mother contends that X.B.'s relationship with his maternal family, especially his older brother K.B., was so strong that he would suffer emotional harm if separated from them. We disagree. The record contains evidence that X.B. loved his maternal family and missed them during his visit with father; however, "[t]hese facts provide no support

11

for 'a finding that there was a high probability that moving [out of California] would have a devastating emotional impact' " on X.B. (*In re John M.*, *supra*, 141 Cal.App.4th at p. 1570.) Rather, the record reveals that X.B. was open to living with father. When the social worker asked him where he would like to live, X.B. responded that if he could not live with mother, he wanted to try living with father. This is not the response of a child who would be emotionally devastated if placed with father.

In any event, even if X.B. *had* expressed an independent, uninfluenced desire to remain with his maternal family, the seven-year-old child's preference is not clear and convincing evidence of emotional detriment. "[A] child's preference is not the deciding factor in a placement decision, even when that child is a teenager." (*In re Patrick S.* (2013) 218 Cal.App.4th 1254, 1265 ["Resignation" to a particular placement "does not constitute substantial evidence of emotional detriment"]; see also *In re John M.*, *supra*, 141 Cal.App.4th at p. 1570 ["While, at [14 years of age], he was entitled to have his wishes considered, [the minor] was not entitled to decide where he would be placed"].)

Mother also argues that the challenges father was facing at the time of the dispositional hearing were detrimental to X.B.'s emotional well-being. The record does not support this contention. The challenges in father's life were that he was separated from his wife and that he was trying to find a job. The evidence in the record demonstrates that father was working through these issues and that, in any event, they did not prevent him from appropriately parenting X.B. Father and his wife both stated that

12

they were working on their marriage. Father had a steady retirement income and was seeking new employment. Father's two homes, the one in Greensboro and the one in Springfield, were evaluated by the investigator and found to be safe and appropriate. There is no evidence in the record to indicate that any of these issues actually had an impact on father's ability to care for X.B.

We also reject mother's contention that it was detrimental to place X.B. with father because father had "very little contact" with X.B. before the dependency case and had expressed uncertainty about becoming X.B.'s custodial parent. Father stated multiple times on the record that he had never wavered in his desire to be X.B.'s custodial parent. In any event, a lack of contact between child and nonoffending noncustodial parent, alone, is not a basis for finding detriment. (See *In re John M.*, *supra*, 141 Cal.App.4th at p. 1571 [court reversed the juvenile court's detriment finding, concluding that the minor's "need for services, his lack of relationship with [father], and the paucity of information about [father] do not support the detriment finding"].)

Simply put, mother and the Department failed to provide the court with clear and convincing evidence of emotional detriment, that is, "evidence is so clear as to leave no substantial doubt." (*In re John M.*, *supra*, 141 Cal.App.4th at p. 1570.) Indeed, counsel for mother appeared to concede that she could not prove detriment when she told the court after reviewing the investigator's report from the extended visit that "there's not really a whole lot that this Court can do at this point." Additionally, the Department's

13

social worker testified during the disposition hearing that he could not point to any reason why X.B. could not be placed with father. The one concern he raised was that father was having issues adjusting to civilian life and that this could negatively affect X.B. However, as just explained, there is no evidence in the record to indicate that it actually did have such an effect. We conclude that substantial evidence supports the court's decision to place X.B. with father.[4]

Mother argues that even if the trial court's placement order was not in error, the court erred in terminating dependency jurisdiction over X.B. because it was in X.B.'s best interests to give mother an opportunity to reunify with him. When the court places a child with a nonoffending noncustodial parent under section 361.2, the court is authorized to "[o]rder that the parent become legal and physical custodian of the child." (§ 361.2, subd. (b)(1).) If a court so orders, it "[must] then terminate its jurisdiction over the child." (*Ibid.*)

A court's decision to deny reunification services to the offending parent and grant the nonoffending parent full legal and physical custody of the child is reviewed for "abuse of discretion." (*In re Nada R.*, *supra*, 89 Cal.App.4th at p. 1179.) We find no

---

[4] We reject mother's argument that "the trial court used the incorrect burden of proof" regarding detriment. This argument stems from the fact that the court referred to making a "finding of *substantial* detriment to the child" during part of the disposition hearing. (Italics added.) However, when the court stated its findings and orders, it recited the detriment language from section 361.2, subdivision (a), and thus the argument is meritless.

14

abuse of discretion here. On the contrary, we conclude that it was reasonable for the court to find that vesting custody with father would be in X.B.'s best interest. The evidence presented to the court was that father was a nonoffending parent that strongly desired custody of X.B. and had the ability to provide X.B. with a healthy, loving environment.

### 1. *There was no ICWA violation*

Mother contends that the court and the Department violated ICWA by failing to appropriately inquire into ICWA's applicability. We disagree.

#### a. *Factual background*

When the Department interviewed mother on March 3, 2014, before filing the original dependency petition in this matter, she stated that she did not have any Native American ancestry. She denied being registered with a tribe or receiving any services from a tribe. Mother mentioned to the social worker that it was "rumored" that she "might have Cherokee on her mother's side of the family."

Two days later, the Department interviewed the maternal grandmother about possible Native American ancestry. The grandmother stated that she was "aware of having some Native American ancestry," but she could not identify any possible tribes.

The next day, mother filed a Parental Notification of Indian Status form in which she declared that the boys' maternal grandmother is or was a member of a federally

15

recognized tribe. She also declared that she may be a member of, or eligible for membership in, the "Cherokee" tribe.

At the detention hearing on the following day, the court found that there was reason to believe that the children may be Indian children and ordered the Department to provide ICWA notice. On March 13, 2014, the Department sent ICWA notices to the Bureau of Indian Affairs (BIA) and the following tribes: Cherokee Nation, Eastern Band of Cherokee Indians, and United Keetoowah Band of Cherokee Indians. The tribes responded that the boys were neither members nor eligible to be members. At the disposition hearing, the court found that ICWA did not apply to either child.

b. *Analysis*

"The ICWA is designed to protect the interests of Indian children, and to promote the stability and security of Indian tribes and families. It sets forth the manner in which a tribe may obtain jurisdiction over proceedings involving the custody of an Indian child, and the manner in which a tribe may intervene in state court proceedings involving child custody." (*In re Z.N.* (2009) 181 Cal.App.4th 282, 297.)

"Among the procedural safeguards included in the ICWA is the provision for notice." (*In re O.K.* (2003) 106 Cal.App.4th 152, 156, as modified (Feb. 10, 2003).) ICWA notice is required "where the court knows or has reason to know that an Indian child is involved" in a case where "[a] party [is] seeking the foster care placement of, or termination of parental rights to, an Indian child." (25 U.S.C. § 1912(a).) In such cases,

16

the party seeking foster care placement or termination of parental rights must notify "the parent or Indian custodian and the Indian child's tribe . . . of the pending proceedings and of their right of intervention." (*Ibid.*) For purposes of ICWA, an "Indian child" is an unmarried minor who is either a member of an Indian tribe or is eligible for membership and is the biological child of a member of an Indian tribe. (25 U.S.C. § 1903(4); see *In re Jose C.* (2007) 155 Cal.App.4th 844, 849 ["[the minor's] membership or the membership of one of [the] biological parents is a requirement to be found to be an Indian child"].) Notice, when given, must "contain enough information to permit the tribe to conduct a meaningful review of its records to determine the child's eligibility for membership." (*In re Cheyanne F.* (2008) 164 Cal.App.4th 571, 576.)

As relevant to this case, a juvenile court has "reason to believe" that a child is an Indian child where the "agency involved in child protection services or family support has discovered information which suggests that the child is an Indian child." (*In re O.K.*, *supra*, 106 Cal.App.4th at p. 156, citing Guidelines for State Courts; Indian Child Custody Proceedings (44 Fed.Reg. 67584, 67586 (Nov. 26, 1979).) However, information that is "too vague, attenuated and speculative" does not trigger the notice requirement. (*In re J.D.* (2010) 189 Cal.App.4th 118, 125.)

For example, ICWA's notice requirements are not triggered when the family member who believes the child might be an Indian child is not an enrolled member of a tribe, cannot identify a particular tribe, and does not know whether he or she or another

17

family member is eligible for tribal membership. In such situations, appellate courts have found the family member's suspicion of Indian ancestry to be too "nebulous" and "speculative" to give a juvenile court any reason to believe that the minor might be an Indian child. (See, e.g., *In re O.K.*, *supra*, 106 Cal.App.4th at pp. 154-157; *In re Hunter W.* (2011) 200 Cal.App.4th 1454, 1467-1468; *In re Z.N.*, *supra*, 181 Cal.App.4th at p. 298.)

"We review the trial court's findings whether proper notice was given under ICWA and whether ICWA applies to the proceedings for substantial evidence." (*In re D.N.* (2013) 218 Cal.App.4th 1246, 1251.)

Mother argues that the court and the Department "utterly failed" to inquire into whether ICWA applied to the children. She asserts that the entire record is "devoid" of evidence that the maternal grandmother "was ever interviewed and asked about any of the necessary information for [ICWA] notices." The record reflects otherwise.

Two days after mother informed the Department that it was "rumored" she had Indian ancestry, the Department interviewed the maternal grandmother about possible Indian ancestry. Despite the fact that grandmother was unable to provide the Department with any information regarding possible tribal membership or membership eligibility, the Department sent ICWA notices to the BIA and three Cherokee tribes (because mother had declared a connection with the "Cherokee" Indians on the Parental Notification of Indian Status form). The notice forms listed the maternal grandmother's name, including

18

other possible names, her current address, two possible birthdates, and possible tribes with which she may have been connected. The three tribes responded that the children were not members and were not eligible to become members.

Based on the information that mother and the maternal grandmother gave the Department, we conclude that even though the Department did provide ICWA notice, such notice was not required in this case. Like the cases cited above, the information that mother and maternal grandmother provided to the court was too nebulous and speculative to trigger ICWA's notice requirement. (See *In re O.K.*, *supra*, 106 Cal.App.4th at pp. 154-157; *In re Hunter W.*, *supra*, 200 Cal.App.4th at pp. 1467-1468; *In re Z.N.*, *supra*, 181 Cal.App.4th at p. 298.) Speculation that one might have Indian ancestry, without more, is insufficient to trigger the notice requirement.

In any event, even if the court and the Department failed to properly inquire into whether ICWA applied to the boys, any error was harmless. ICWA's protections apply to Indian children who are at risk of being removed from their families and placed "in foster or adoptive homes." (*In re O.K.*, *supra*, 106 Cal.App.4th at p. 155.) California law imposes on the Department and the juvenile court "an affirmative and continuing duty to inquire whether" a child for whom a dependency petition has been filed may be an Indian child if the child "is at risk of entering foster care." (§ 224.3, subd. (a).) Assuming for the sake of argument that the boys are Indian children, ICWA's protections are unnecessary because X.B. was placed with his biological father and K.B. remained

19

placed with his maternal grandmother, the relative mother believed to have Indian ancestry.

## III

## DISPOSITION

The judgment is affirmed.


RAMIREZ_____
                                                                        P. J.

We concur:


KING_____
                        J.


MILLER_____
                        J.

Filed 8/24/15

**CERTIFIED FOR PARTIAL PUBLICATION**

**IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA**

**FOURTH APPELLATE DISTRICT**

**DIVISION TWO**

| | |
|---|---|
| In re K.B. et al., Persons Coming Under the Juvenile Court Law. | |
| RIVERSIDE COUNTY DEPARTMENT OF PUBLIC SOCIAL SERVICES,<br><br>        Plaintiff and Respondent,<br><br>v.<br><br>K.B.,<br><br>        Defendant and Appellant. | E061803<br><br>(Super.Ct.No. RIJ1400250)<br><br>ORDER MODIFYING OPINION AND GRANTING PARTIAL PUBLICATION<br><br>[NO CHANGE IN JUDGMENT] |

1

IT IS ORDERED that the opinion filed in this matter on August 7, 2015 is modified as follows:

1.      Part I.A.1. on page 5 reading, 1. *Disposition* shall be deleted.  It shall be replaced with the following:  B.  *Disposition*.

2.      Part II.A.1. on page 15 reading, 1. *There was no ICWA violation* shall be deleted.  It shall be replaced with the following:  B.  *There was no ICWA violation*.

3.      Part II.A.1.a on page 15 reading, a. *Factual background* shall be deleted. It shall be replaced with the following:  1.  *Factual background*.

4.      Part II.A.1.b on page 16 reading, b. *Analysis* shall be deleted.  It shall be replaced with the following:  2.  *Analysis*.

5.      The first two sentences in the first paragraph on page 14 reading, The one concern he raised was that father was having issues adjusting to civilian life and that this could negatively affect X.B.  However, as just explained, there is no evidence in the record to indicate that it actually did have such an effect, shall be deleted.  They shall be replaced with the following sentence:

> The one concern he raised was that father was having issues adjusting to civilian life and that this could negatively affect X.B.; however, no evidence indicates that father's adjustment actually did have such an effect.

IT IS FURTHER ORDERED that certification of the opinion for nonpublication dated August 7, 2015 is hereby vacated and set aside.  On pages 1 and 20 of the opinion, the words NOT TO BE PUBLISHED IN OFFICIAL REPORTS are replaced with the words CERTIFIED FOR PARTIAL PUBLICATION, and those words on page 1 are followed by insertion of the following footnote:

3

\*Pursuant to California Rules of Court, rules 8.1105(b) and 8.1110, this opinion is certified for publication with the exception of part II.B.

IT IS FURTHER ORDERED that the request for publication of the opinion filed on August 7, 2015 is GRANTED with the exception of part II.B pertaining to ICWA. The opinion meets the standards for publication as specified in California Rules of Court, rule 8.1105(c).

Except for these modifications, the opinion remains unchanged. These modifications do not effect a change in judgment.

RAMIREZ
P. J.

We concur:

KING
J.

MILLER
J.