Filed 2/24/21  In re A.A. CA4/2

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FOURTH APPELLATE DISTRICT

## DIVISION TWO

| | |
|---|---|
| In re A.A., a Person Coming Under the Juvenile Court Law. | |
| SAN BERNARDINO COUNTY CHILDREN AND FAMILY SERVICES, | E075423 |
| Plaintiff and Respondent, | (Super.Ct.No. J284914) |
| v. | OPINION |
| H.A., | |
| Defendant and Appellant. | |

APPEAL from the Superior Court of San Bernardino County.  Steven A. Mapes, Judge.  Affirmed.

Christopher R. Booth, under appointment by the Court of Appeal, for Defendant and Appellant.

Michelle D. Blakemore, County Counsel, and David Guardado, Deputy County Counsel, for Plaintiff and Respondent.

1

I

INTRODUCTION

Defendant and appellant H.A. (Mother) appeals from the juvenile court's

dispositional orders under Welfare and Institutions Code[1] section 361.2 placing her three-

year-old son (Ad.A.) with his father Ab.A. (Father), terminating its jurisdiction, and

granting Father sole legal and physical custody of the child. Mother contends the

juvenile court abused its discretion in granting Father sole legal and physical custody of

the child, denying her reunification services, and terminating its jurisdiction. Mother

argues the juvenile court should have instead continued its jurisdiction and provided

Mother with reunification services. We find no abuse of discretion and affirm the

juvenile court's dispositional orders.

II

FACTUAL AND PROCEDURAL BACKGROUND

The family came to the attention of the San Bernardino County Children and

Family Services (CFS) on April 21, 2020, after a referral was received alleging that

Mother had been placed on an involuntary mental hold pursuant to section 5150

following an altercation between herself, her father, and her brother. Mother reported

that she was having a panic attack, which was something not allowed in her culture, and

her father responded by punching her in the head and choking her. She also stated that

her parents locked her in a secured room with security cameras and that she was not

_____

[1] All future statutory references are to the Welfare and Institutions Code.

allowed to leave the home. Mother further reported that she had a total of 10 hospitalizations for suicidal ideations and that her parents disciplined her then two-year-old son by hitting him.

The maternal grandfather reported that he had received a call from the maternal grandmother informing him that Mother had attempted to grab a knife on April 21, 2020. Mother was able to be restrained until the maternal grandfather arrived home and took her upstairs away from the family and law enforcement was called. The maternal grandfather also stated that Mother began residing in the home on January 5, 2020, after Father asked if the maternal grandparents would take Mother and the child into their home as their relationship was not going well. Approximately two weeks after she moved in, Mother called the maternal grandfather and stated that she was going to commit suicide. Mother was hospitalized following this incident. The maternal grandfather also reported that Mother had choked the child previously, so he had removed the child from her supervision. Mother began taking medication and her behavior stabilized until the April 21, 2020 incident when she began crying after talking about Father. The maternal grandfather suspected that Mother had not taken her medication that week and noted the secured room was for safety reasons.

The maternal grandmother reported that Mother was depressed about Father leaving her and suspected that Mother had not been taking her medication. She had observed Mother to have scratches on her arms and she attempted to talk to Mother regarding the injuries, but Mother instead became upset and went to her bedroom.

3

Mother then returned and attempted to hit the maternal grandmother and the maternal uncle. The maternal grandfather moved Mother upstairs and kept her there until law enforcement arrived. The maternal grandmother denied that the maternal grandfather had punched or assaulted Mother.

The maternal uncle reported that Mother had attempted to get a knife and threatened to kill him. He also stated that after Mother had choked the maternal grandmother, he grabbed Mother and held her down until the maternal grandfather arrived home. When the maternal grandfather came home, Mother began attacking the maternal grandfather. The maternal uncle further reported that Mother had attempted to commit suicide previously by jumping in front of moving vehicles, and that she had stated that when she does succeed, she would "take [the child] out of this world" and began choking the child. The maternal uncle did not feel safe when Mother was around.

Mother was interviewed and accused her family of hitting the child. She explained that on April 21, 2020, the family was not allowing the child to play with his toys and the maternal grandmother hit him. Mother reported a prior diagnosis for depression and suicidal ideations following the birth of her child and admitted cutting her wrists to "take [] out the pain." She began taking medication for her mental health issues in 2017 and wanted to receive therapy but her family would not allow her to. Mother stated that Father had left her and the child at the maternal grandparents' home and that they were still married. She expressed no concerns regarding Father's ability to care for the child and noted that she did not mind the child being placed with Father.

4

The social worker spoke with Father on April 21, 2020. Father reported that he was able to care for the child emotionally and financially and to meet the child's needs. He also expressed protective capacity to care for the child, such as not allowing Mother unsupervised contact, and disclosed the child was not safe under Mother's supervision due to her mental health. Father had no mental health issues, history of substance abuse, or criminal history. He noted that he had recently relocated from North Carolina to Tracy, California, and provided the social worker with his address. Father resided with his paternal uncle and aunt. Father explained that after he left Mother and the child with the maternal grandparents, he went back to North Carolina because his employment was there. He stated that he had attempted to maintain contact with the child but Mother would not allow him to do so. Father also reported that Mother had longstanding mental health issues predating his relationship with her and that Mother had cut her wrists and attacked him. Background checks on Father and the family with which he resided showed no concerns, and the child was placed in his care.

On April 24, 2020, a petition was filed pursuant to section 300, subdivisions (a) (serious physical harm), (b) (failure to protect), and (g) (no provision for support) based on Mother's aggressive conduct towards the child and her family, Mother's untreated mental health issues, Mother's inability to care for the child, and Father's knowledge of Mother's untreated mental health issues.

The detention hearing was held on April 27, 2020. Both Mother and Father were present and submitted on the issue of the child remaining in Father's care. The juvenile

5

court formally detained the child from Mother's care and ordered him to be placed in Father's care. Father was ordered to keep CFS advised of the child's whereabouts and not to change his residence without prior notice to the social worker. Mother was provided with supervised visits once a week for two hours.

CFS recommended that the child be removed from Mother's care, the allegation against Father be dismissed, the child placed with Father, and the dependency matter dismissed. Father explained that although he knew Mother had mental health issues, he did not foresee that she would be a danger to the child and believed him to be safe while residing with the maternal grandparents. Father had explored options for maintaining custody of the child when he and Mother separated, but believed he could not do so as the law was that a child "'goes to the mother.'" Father stated that he wanted full custody of his child and did not want Mother to have custody of their son.

The maternal grandfather was interviewed again and reiterated his prior statements. He explained that Mother had made accusations against him and the maternal grandmother that they abused both her and the child and that law enforcement told him it was best for the maternal grandparents to not get involved due to Mother's serious allegations against them. In spite of Mother's allegations, the maternal grandfather was not charged as Mother herself was found to be the aggressor. It was reported that Mother had choked the child and had attempted to stab him with a knife.

Mother was contacted at her mental health facility and again accused the maternal grandparents of using physical discipline against the child. She also accused the maternal

grandfather of grabbing her and choking her. Mother stated that the maternal grandfather had attempted to kill her and the maternal uncle had attempted to stab her with a knife. She asserted that she was diagnosed with depression, anxiety, and panic attacks and that she had attempted suicide on multiple occasions. Mother indicated she felt the child was safe with Father, and she believed it to be in the child's best interest to remain with Father. She had no worries with Father raising the child, noting Father wanted the child. She also pointed out that when they were together, Father "'woke up in the middle of the night to help with [the child].'"

The social worker had observed the child in Father's care and found that he was well taken care of with no concerns regarding Father's parenting ability. The social worker noted that the child appeared to be happy, healthy, and bonded to Father, and did not have any visible, suspicious marks or bruises. Based on her observations as well as information obtained in the investigation, the social worker believed there would be no detriment to placing the child with Father and having the court dismiss the petition with family law court orders. Due to Father's residence in Northern California, the ongoing COVID-19 pandemic, and Mother being admitted into a mental health hospital, in-person visitation between Mother and the child had not occurred.

On June 1, 2020, the juvenile court held a combined jurisdictional/dispositional hearing. Mother was present and Father had been excused. Mother requested mediation to address jurisdictional issues as well as visitation orders. Mediation was thus set.

7

Mediation was held on June 23, 2020. At that time, the parties agreed to amend the allegations in the section 300 petition. Mother objected to dismissal of the case with the child in the care and custody of Father and requested that she receive family reunification services. The child's counsel had been unable to visit the child in Father's home in Northern California and therefore objected to dismissal of the case.

On June 29, 2020, the juvenile court held a further contested jurisdictional/ dispositional hearing. Mother waived her rights and the court proceeded on jurisdiction based upon the mediated agreement. The court found true the section 300, subdivision (a) allegation as amended regarding Mother's risk of physical abuse to the child as well as one section 300, subdivision (b) allegation as amended concerning Mother's mental health issues. All of the remaining allegations in the petition were dismissed. The court thereafter continued the contested dispositional hearing at minor's counsel's request to allow counsel the opportunity to see the child in Father's home.

The contested dispositional hearing was held on July 16, 2020. Mother was present and Father was excused from being present. For the hearing, CFS had filed two additional reports explaining further investigation in the case. It was reported that Father and the child had left the United States for Palestine on July 10, 2020, to attend to his mother. Father explained that "his mother [was] very sick, so he and [the child] left suddenly to see his mother in Palestine" and that "'[i]t was an emergency situation.'" Father stated that he did not know that he needed court approval to travel with the child and that he intended to return to California but could not provide a set date as to when

that would occur. Despite Father leaving the country without permission, CFS opined it was still in the child's best interest to have the dependency case dismissed with family law court orders, giving full custody to Father.

CFS also informed the court that Mother had informed the social worker that she had attempted to contact Father several times concerning visitation with the child. Father acknowledged that Mother had not yet had in-person contact with the child since his removal from Mother's care due to the pandemic and conflicting schedules. Father indicated that he was willing to allow the child to have contact with Mother and believed Mother may have been calling him while he was working and his phone was on airplane mode. Father agreed to contact Mother at times when he was available to facilitate visitation.

At the contested dispositional hearing, Mother's counsel expressed concern regarding Father's travel to Palestine and requested that the court continue the matter and order that Father be present in court. Minor's counsel also requested a continuance as, although counsel had seen the child in Father's home, counsel desired to see how he was doing given the travel out of the country. Prior to knowledge of the travel, minor's counsel acknowledged that he agreed with the recommendation to dismiss the dependency case.

CFS's counsel opposed the continuance, arguing there was no reason to continue the matter. CFS's counsel noted that the child had been placed with Father since the beginning of the case, Mother had specifically stated the child was safe in Father's care,

9

and Father was specifically excused as a witness. CFS's counsel also asserted that the "only thing that has changed" was Father leaving the country for an emergency, "but there [was] no evidence of any change posing a risk to this child." CFS's counsel explained, "Father and Mother came here from Palestine. They were married in Palestine in 2019, so this is not a new situation for the mother. She came here from Palestine in 2019. I don't believe there is a safety risk in keeping this case open. We would like to dismiss with a custody order."

The juvenile court agreed with CFS's counsel, noting "[n]obody's happy that he just went . . . to Palestine, but all of the factors have to be considered. The child is not at risk. Everything from the reports indicates that Father is a very capable, fit parent, and the child is safe." The court viewed Father leaving the country as a family emergency and proceeded with the matter.

Thereafter, the juvenile court heard testimony from Mother and the social worker. Mother testified that she had informed the social worker she had no concerns regarding the child in Father's care and that the child was safe in his care. However, Mother no longer felt it appropriate, claiming she had previously lied about the child in Father's care because she felt threatened by him and believed Father would attempt to keep the child from her. She noted that Father had not provided her with supervised visitation, explaining she had tried to call the child every day on the phone.

Mother acknowledged that she had spent two months in a mental health facility, that she had a history of severe mental health issues, and that she had attempted suicide

10

every year since 2018. Nonetheless, she believed her mental health issues could be resolved in a matter of weeks, noting she had voluntarily engaged in psychological, psychiatric, and individual therapy. Mother intended to remain compliant with treatment and expected to overcome her mental health issues.

The social worker testified that, to her knowledge, Mother had engaged in therapy once a week and had seen her psychiatrist, but Mother had not signed consent requests so the social worker could speak to her therapists. The social worker noted that she had discovered Father went to Palestine the day prior to the dispositional hearing and that prior to Father leaving the country, Father had cooperated with CFS. The social worker acknowledged that Father had not provided any proof of an emergency for leaving to Palestine. In response to the court's query of whether there was any prohibition about Father traveling with the child, the social worker stated, "I believe it's in the minute order, but I personally did not tell him."

After the juvenile court heard oral argument from the parties on the dispositional issues, the court found Father's trip to Palestine was not specifically prohibited, and that even if there were orders regarding a need to keep the social worker advised of the child's location, Father was a lay party and may not have realized that such a trip might appear suspicious. The court also determined that given her mental health issues, Mother was not suitable for joint legal custody at that time and did not find Mother's testimony believable. Specifically, the court explained, "and even though [Mother] is under penalty of perjury today, she is making statements today that are more convenient to her position.

11

Whereas earlier on in the case, she was, in my mind, making more honest statements. I don't see any circumstances indicating undue pressure from Dad or threats or force that she is claiming now. I think this argument she is making today is one of convenience to her position that is different. [¶] And then, I've been looking carefully at the previous Court orders and minute orders. I don't see anything about not leaving the state or country."

When the juvenile court inquired of the parties whether there was a specific order preventing Father from traveling, CFS's counsel responded that he did not recall the court making such an order. No other party responded or pointed to any orders Father may have violated, such as the orders made at the detention hearing.[2] The court thereafter continued to explain its finding, stating, "when I'm assessing danger to the child, one of the factors—it's like, did this guy disobey an order of the Court or some condition that CFS put on him? That could be a factor. I don't see that was ever given, so I'm trying to put my reasoning in what he is thinking, and he is thinking, I have custody of the child. There's no order prohibiting me. [¶] Common sense would be like, yeah, you shouldn't go, but [Father] is not a lawyer. So there is no specific prohibition. If there were a specific prohibition, I would be more concerned about the danger aspect, but because there is no specific prohibition, I'm less concerned about the danger aspect because that

---

[2] Specifically, at the detention hearing, the juvenile court ordered Father to (1) "keep the county agency advised of [the child's] whereabouts and cooperate with the social worker"; (2) "not change the location of the [child] without prior notice to the social worker"; and (3) allow the child's "attorney and/or [his] social worker access into the family home and access to" the child.

12

means he wasn't trying to do anything sinister. At least by that aspect, so that's why I'm making a big deal of looking back at the prior minute orders, if CFS had said, 'Don't leave the state or the country.' [¶] . . . Normally, we say, if you change your address or move, let us know. That is more generic. Maybe in the future we should just have a generic order so there is no misunderstandings. Easily this could be easily misunderstood. You know, our intent versus what it says."

The court concluded Mother was not in a position to have joint legal custody at that time, but explained that Mother was "free to go to the family law court as her situation changes, and she can ask the family law court to revisit the joint-legal-custody issue as she is able to show the Court she is more capable of making those decisions" and encouraged Mother to keep working on her mental health issues. The court provided Mother with visitation once a week on Saturday or Sunday for a 30-minute video conference and ordered Father to comply with the visitation order. The court then found Father to be the nonoffending, noncustodial parent and terminated its jurisdiction with family law orders providing sole legal and physical custody of the child to Father. This appeal followed.

## III

## DISCUSSION

Mother contends the juvenile court abused its discretion when it granted Father sole legal and physical custody of the child and by denying her reunification services and terminating jurisdiction over the case. She believes that the court, at a minimum, should

13

have granted a continuance of the contested dispositional hearing, requested both by Mother and the child's counsel, to clarify the situation with Father present. Mother thus argues the court's dispositional orders should be reversed. We disagree.

"'A parent's right to care, custody and management of a child is a fundamental liberty interest protected by the federal Constitution that will not be disturbed except in extreme cases where a parent acts in a manner incompatible with parenthood.'" (*In re Abram L.* (2013) 219 Cal.App.4th 452, 461 (*Abram*).) A nonoffending parent has a constitutionally protected interest in assuming physical custody of his or her dependent child which may not be disturbed "'in the absence of clear and convincing evidence that the parent's choices will be "detrimental to the safety, protection, or physical or emotional well-being of the child."'" (*Ibid.*)

Section 361.2, subdivision (a), governs the rights of a noncustodial parent to custody of a dependent child. (*In re C.M.* (2014) 232 Cal.App.4th 1394, 1401 (*C.M.*).) When "a court orders removal of a child pursuant to Section 361, the court shall first determine whether there is a parent of the child, with whom the child was not residing at the time that the events or conditions arose that brought the child within the provisions of Section 300, who desires to assume custody of the child. If that parent requests custody, the court *shall* place the child with the parent unless it finds that placement with that parent would be detrimental to the safety, protection, or physical or emotional well-being of the child." (§ 361.2, subd. (a), italics added.) Section 361.2, subdivision (a), "evinces

14

the legislative preference for placement with the noncustodial parent when safe for the child." (*In re Patrick S.* (2013) 218 Cal.App.4th 1254, 1262 (*Patrick S.*).)

"Under the plain terms of the statute, if the juvenile court finds that placing a child in the physical custody of a noncustodial parent would not be detrimental to the child within the meaning of section 361.2, subdivision (a), it must place the child in the physical custody of the noncustodial parent." (*Abram L.*, *supra*, 219 Cal.App.4th at p. 461.) The noncustodial parent does not have to prove lack of detriment under section 361.2, subdivision (a). (*C.M.*, *supra*, 232 Cal.App.4th at p. 1402.) Rather, "[i]t is the burden of the party or parties opposed to such placement to prove detriment by 'clear and convincing evidence.'" (*In re K.B.* (2015) 239 Cal.App.4th 972, 979 (*K.B.*); accord, *C.M.*, at p. 1402.) "Clear and convincing evidence requires a high probability, such that the evidence is so clear as to leave no substantial doubt." (*Patrick S.*, *supra*, 218 Cal.App.4th at p. 1262.)

A court has three options when placing a child with the noncustodial parent under section 361.2, which we summarize: the court may (1) grant legal and physical custody to the noncustodial parent and terminate jurisdiction; (2) grant custody to the noncustodial parent subject to a home visit by a social worker; or (3) grant custody to the noncustodial parent subject to the supervision of the juvenile court, in which case the court may provide services to one or both parents, either to allow possible reunification with the parent from whom the child is being removed, or to allow the parent taking custody to later assume custody without court supervision. (§ 361.2, subd. (b)(1)-(3).)

In this case, the juvenile court selected the first option, granting Father full custody and terminating jurisdiction without ordering reunification services for Mother. We review this decision for abuse of discretion. (*K.B.*, *supra*, 239 Cal.App.4th at p. 981.)

We find no abuse of discretion here. The court selected one of the three allowable statutory options. There was no indication in the record that the child was not safe in Father's care, that Father posed a risk of detriment to the child, or that it would be detrimental to allow the child to reside in Father's care. During the social worker's various interviews with her, Mother expressed no concerns regarding Father's ability to care for the child or that the child was not safe in Father's home. Rather, she repeatedly stated that she had no worries with Father raising the child, that she did not mind the child being placed with Father, and that she believed it to be in the child's best interest to remain with Father. Mother also described how Father had taken good care of the child when they resided together. The social worker had observed the child in Father's care and found that he was well taken care of with no concerns regarding Father's parenting ability. The social worker noted that the child appeared to be happy, healthy, and bonded to Father and believed there was no detriment to placing the child with Father. Having placed the child with Father, the court was not obliged to provide reunification services to Mother.

As noted by the juvenile court, it was not until it was the most convenient and beneficial to Mother did she elect to raise concerns of Father threatening her safety. The court found Mother's statement concerning Father's purported threats less honest and

16

noted no circumstances indicating undue pressure, threats, or force by Father. If Mother in fact had felt threatened by Father, it would not have made sense for her to keep that information from the social worker considering that she was willing to provide negative information about the maternal grandparents and her other relatives.

Mother primarily points to Father's trip to Palestine as evidence of detriment and the juvenile court's prior generic orders at the time of the detention hearing. As previously noted, those generic orders required (1) Father to keep CFS advised of the child's whereabouts and to cooperate with the social worker; (2) Father to not change the child's location without CFS approval; and (3) Father allowing the child's "attorney and/or [his] social worker access into the family home and access to" the child.

While the juvenile court may consider Father leaving the country without permission, as it did in this case, and the generic orders made at the detention hearing, neither factor showed by clear and convincing evidence that the child will be harmed if Father is given custody of the child. The juvenile court here found that Father was not specifically informed to not leave the state or the country and that there was no specific order prohibiting Father from leaving the country. The court also determined that the generic orders were insufficient to show Father violated any court order because those orders "could be easily misunderstood." There was no reason for the court not to believe the information that Father was required to leave California to address a family emergency and that Father likely did not understand the appearance of such a trip. The factors as noted by Mother are simply insufficient to deny Father his constitutionally

17

protected right to custody in a dependency proceeding where he was found to be the nonoffending, noncustodial parent who desired custody of his child. Mother, as the party opposing placement with a noncustodial parent, did not meet her burden to show by clear and convincing evidence that the child would be harmed if placed in Father's custody. (*C.M.*, *supra*, 232 Cal.App.4th at p. 1402; *K.B.*, *supra*, 239 Cal.App.4th at p. 979.)

We note that the juvenile court's decision in no way forecloses Mother from seeking custody of the child at a later time. Section 361.2, subdivision (b)(1), states that "[t]he custody order shall continue unless modified by a subsequent order of the superior court." Mother's commendable efforts in participating in mental health services and individual therapy would presumably be factors considered by a court if Mother requests the custody order be modified.

IV

DISPOSITION

The judgment is affirmed.

NOT TO BE PUBLISHED IN OFFICIAL REPORTS

CODRINGTON

J.

We concur:


MILLER

Acting P. J.


FIELDS

J.


18