Filed 8/27/25  In re K.T. CA4/1

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| In re K.T. et al., Persons Coming Under the Juvenile Court Law. | D085582 |
| SAN DIEGO COUNTY HEALTH AND HUMAN SERVICES AGENCY, <br><br> Plaintiff and Respondent, <br><br> v. <br><br> E.T. et al., <br><br> Defendants and Appellants, <br><br> M.T., <br> Respondent. | (San Diego County Super. Ct. No. J521505A,B) |

APPEAL from orders of the Superior Court of San Diego County, Alexander M. Calero, Judge.  Affirmed.

Leslie A. Barry, under appointment by the Court of Appeal, for Defendants and Appellants K.T. and L.T.

Jack A. Love, under appointment by the Court of Appeal, for Defendant and Appellant E.T.

Linda Rehm, under appointment by the Court of Appeal, for Respondent M.T.

Claudia G. Silva, County Counsel, Lisa M. Maldonado, Chief Deputy County Counsel, and Kristen M. Ojeil, Deputy County Counsel, for Plaintiff and Respondent.

K.T. and L.T. were removed from their mother E.T.'s care. The juvenile court placed the children with their noncustodial father M.T. subject to the continued jurisdiction of the court. K.T., L.T., and Mother contend the court erred because placement with Father is detrimental to the children's emotional well-being. We conclude there was no error, and we affirm.

FACTUAL AND PROCEDURAL BACKGROUND

Mother and Father married in 2009. In 2010, K.T. was born and in 2012, L.T. was born. In 2019, Father was arrested for domestic violence and sustained a DUI. The following year, Mother and Father finalized their divorce in New Jersey and split custody of the children 50/50. In 2021, Mother and the children moved to San Diego.

In January 2024, San Diego County Health and Human Services (Agency) received three referrals alleging abuse and general neglect by Mother. The first referral included allegations that Mother drove "drunk and high" with the children in her vehicle, that Mother did not feed the children, that the home was unkept and dirty, and that she called the children names. An investigation found insufficient information to substantiate the reports. The second referral alleged Mother drove the children and a friend to the mall while under the influence. Once K.T. realized Mother was drunk, she called and asked her maternal aunt to pick them up. The referral was evaluated out. The third referral in January alleged Mother was drunk and engaged in a physical altercation with K.T. K.T. reported not feeling safe

2

with Mother and called her maternal aunt for help. The Agency determined these allegations were inconclusive.

In February, the San Diego Police Department responded to a welfare check after a third party called to report Mother left K.T. alone in the car for over an hour outside of a fast-food restaurant. A police officer found Mother at home drunk. That night, the children stayed with their maternal aunt. The Agency concluded Mother was neglectful of the children.

In April, the Agency opened a voluntary services case to support Mother with her substance use disorder, but she declined participation.

On October 16, L.T. found explicit text messages on Mother's phone between Mother and a neighbor. The messages consisted of several graphic conversations in which Mother gave the neighbor permission to perform sexual acts on her and her minor daughters and included revealing pictures of then-thirteen-year-old K.T. and eleven-year-old L.T. K.T. and L.T. reported feeling "scared, speechless, and grossed out." The next day, K.T. showed the maternal aunt the messages. The maternal aunt reported the incident to the police.

On October 22, the Agency spoke with Father. He explained he had believed Mother was back on track after the investigation relating to Mother leaving K.T. in the car. Two days later, Father flew to San Diego and expressed his desire to take the children to Delaware with him. He explained he had a bedroom ready for them, made arrangements for them to start therapy, and identified a school. Father created a safety plan with the Agency, which included taking the children to his home. Father told the Agency he was arrested for domestic violence allegations and for driving under the influence several years earlier, but explained he took anger management classes and received help for his drinking.

On October 25, the maternal aunt failed to produce the children at the designated time and place for pickup by Father. Her husband confirmed she left with the children, and he stated he did not know their whereabouts. The Agency advised Father to call the police. On October 29, the Agency informed the maternal aunt it had obtained a warrant to take the children into protective custody, prompting her to return them. The next day, a family court granted the maternal aunt temporary emergency custody of the children.

On October 31, the Agency filed a petition under section 300, subdivisions (b) and (d) of the Welfare and Institutions Code,[1] alleging Mother failed to protect the children from a substantial risk of sexual abuse. (§ 300, subd. (b).)

At the November 1 detention hearing, the juvenile court granted the Agency's petition, finding a prima facie showing had been made that continued care in Mother's home was contrary to the children's welfare. The juvenile court also noted that the family court granted custody of the children to the maternal aunt, and that Mother and the children opposed placement with Father. The Agency requested placement with Father. The court observed Father had done nothing wrong and there was no evidence of detriment. However, the court explained it would not yet place the children with Father to avoid "moving them to the other side of the country overnight" while awaiting the dispositional hearing.

During forensic interviews conducted in October 2024, L.T. recalled Father drinking, fighting, and yelling with Mother but denied any other concerns. She stated she did not know Father and did not want to leave San

---

1    Further undesignated statutory references are to the Welfare and Institutions Code.

4

Diego, but she agreed to visit with him. K.T. expressed similar concerns about not knowing Father or his wife and not wanting to leave her friends, but she denied feeling unsafe when visiting Father. Mother recounted past domestic violence by Father and did not want the children to leave the state, but she did not oppose him visiting the children.

Father's adult son, T.T., denied any concerns about the children living with Father and stated he "plan[ned] to help out as needed" because the children "deserve a better life and consistency."

Father's wife, C.T., expressed no safety concerns with Father, stated they do not keep alcohol in their home, and shared Father only drinks occasionally at a restaurant or golf course. She explained Father's job requires drug and alcohol testing, and he had never had an issue. C.T. denied any domestic violence with Father and stated she would not tolerate it. She confirmed they were willing and able to care for the children and had a bedroom set up for them since March. She also shared that the prior visits with the children had gone well and there were no issues.

On November 8, K.T. was diagnosed with anorexia nervosa. A doctor referred her to the emergency room out of concern "her heart would stop." K.T.'s psychologist recommended family based treatment to address her eating disorder. The psychologist explained family based treatment requires the caregiver to be in charge of "all feeding, meal plans, calorie intake, and hydration."

On November 11, social workers visited K.T. while she was in the hospital. K.T. stated both Mother and Father had been "mean" to her. She did not remember how Father would discipline her, but she recalled being spanked by him a long time ago. K.T. explained Mother would take her phone away or spank her if she got in trouble.

5

On November 13, social workers met with L.T. at the maternal aunt's home. L.T. stated she did not remember living with Father before moving to San Diego. Nevertheless, L.T. stated Father "used to drink and hit" her, but she would feel "fine visiting with him every day for a few hours as long as it was in San Diego." She explained she did not want to go live with Father because her friends are in San Diego. L.T. shared that during their summer visit to Delaware, they went to Six Flags and on T.T.'s boat. L.T. explained she felt safe with the maternal aunt.

On November 19, a social worker met with Father. He expressed concerns regarding the children living with the maternal aunt because "they are too close to [Mother]" and referenced an incident in which the maternal aunt hit K.T. in the nose. He believed he could provide a safe environment for the children.

During a family meeting with K.T.'s doctors, the doctors explained the proposed treatment plan included hospitalization, residential treatment, and outpatient care. The psychologist stressed the importance of K.T. living in a home "where there has been no abuse" for the treatment to be successful. Father inquired about Children's Hospital of Philadelphia (CHOP), and the psychologist said it was a great program. During a later meeting between the social worker and psychologist, the psychologist described the maternal aunt's "eating beliefs" as unhelpful, but noted she was open to learning. Similarly, the psychologist explained Mother's visits to K.T. were not in K.T.'s best interests. She noted there had been mention of some negative text messages relating to Father but described Father's commitment to learning about K.T.'s treatment and locating CHOP as a positive indicator.

The social worker conducted additional interviews with the children's adult half-siblings and a cousin, all of whom stressed they had no concerns with the children living with Father and denied he was abusive.

On November 22, the juvenile court held a special hearing at the Agency's request to renew its petition under section 361.2, subdivision (a) for the children to be detained with Father. The court declined to modify the detention orders because the jurisdiction and disposition hearing was scheduled for December 2. The court encouraged Father to have as much visitation and contact with the children as possible.

On December 2, the juvenile court held the jurisdiction and disposition hearing. Father agreed with the Agency's recommendations, renewed his request to have the children detained with him, and asked the court to admonish the maternal aunt for interfering with his visits and communication with the children. The children, through their attorney, opposed placement with Father and expressed similar concerns regarding the maternal aunt interfering with their time with Father. The court ordered an extended visit with Father over winter break.

On January 6, 2025, K.T.'s therapist spoke with the social worker about K.T. and Father's therapy sessions. The therapist described the sessions as "pretty emotional." The therapist noted K.T. and Father did a good job listening to each other, are committed to having a better relationship, and K.T. ended the session by telling Father she loves him.

On January 29, the juvenile court held a pretrial status conference during which it denied the maternal aunt's request to be declared a de facto parent.

In February, the juvenile court held the contested jurisdiction and disposition trial. K.T. testified she was doing well in her residential

treatment for her eating disorder, but she was concerned moving to Delaware would trigger a relapse. She reiterated her desire to remain in San Diego with her aunt and friends while denying any safety concerns with Father. L.T. expressed similar concerns about leaving her aunt, Mother, and friends and had no safety concerns about Father. The Agency maintained its recommendation for placement with Father based on the lack of safety concerns and his ability to care for the children.

Acknowledging the children had been vocal about not wanting to leave San Diego, the Agency explained the children had been referred to therapy to help them work on the relationship with their father and paternal family. The Agency explained it had considered the emotional impact on the children and assessed no safety concerns if placed in Delaware. Father testified he located a nearby school for the children to attend in Delaware, identified two possible programs for K.T. to continue her eating disorder treatment, identified a therapy provider for L.T., and confirmed his insurance would cover all services for the children. Father explained C.T., T.T., and a cousin were able to assist with the children.

The juvenile court removed the children from Mother's custody and ordered their placement with Father. The court further ordered a transition plan that was to take into account the children's input as to travel accommodations, therapy, visitation, and continuing education.

At the April 2025 family maintenance review hearing, the juvenile court ordered Mother and Father to family court services mediation, set a

pretrial status conference, and set subsequent contested review hearings regarding Mother's request for custody of the children.[2]

## DISCUSSION

K.T., L.T., and Mother contend the placement with Father in Delaware is detrimental to the children's emotional well-being, pointing to a purported lack of "relationships and rapport with Father . . . [and] their exposure to Father's alcohol use and violence."

A. Guiding Principles

If a dependent child would be at substantial risk of physical or emotional harm if left in parental custody, but there is a noncustodial parent who is willing to assume custody, the court must "determine whether there is a parent of the child[ren], with whom the child[ren were] not residing at the time that the events or conditions arose that brought the child[ren] within the provisions of Section 300, who desires to assume custody of the child[ren]." (§ 361.2, subd. (a).) If such a noncustodial parent exists, the court is required to place the child with the noncustodial parent unless it finds that doing so would be "detrimental to the safety, protection, or physical or emotional well-being of the child[ren]." (*Id.* subds. (a) & (b)(1); *In re Maya L.* (2014) 232 Cal.App.4th 81, 97–99.)

Mother and the children, as the parties opposing placement with the noncustodial parent, bore the burden of proof. They were required to show detriment to the " 'emotional well-being of the child[ren]' " "by clear and convincing evidence that the child[ren would] be harmed if [Father was] given custody." (*In re C.M.* (2014) 232 Cal.App.4th 1394, 1401.) "Clear and

---

[2] The Agency's unopposed request for judicial notice of the juvenile court's minute orders dated April 8, 2025, May 5, 2025, May 27, 2025, June 12, 2025, and June 13, 2025, is granted. (Evid. Code, §§ 452, subd. (d), 459.)

9

convincing evidence requires a high probability, such that the evidence is so clear as to leave no substantial doubt." (*In re Patrick S.* (2013) 218 Cal.App.4th 1254, 1262 (*Patrick S.*).)

We apply the substantial evidence standard to review a juvenile court's detriment finding under section 361.2, subdivision (a). (*Patrick S., supra*, 218 Cal.App.4th at p. 1262.) The question before us is " 'whether the record as a whole contains substantial evidence from which a reasonable fact finder could have found it highly probable that the fact was true.' [Citation.] We view the record in the light most favorable to the prevailing party and give due deference to how the trier of fact may have evaluated the credibility of witnesses, resolved conflicts in the evidence, and drawn reasonable inferences from the evidence." (*In re M.V.* (2022) 78 Cal.App.5th 944, 960.) We do not reweigh evidence or reassess the credibility of witnesses; instead, we review the record for evidence of reasonable, credible and solid value such that a reasonable trier of fact could find as the juvenile court did. (*In re K.B.* (2015) 239 Cal.App.4th 972, 979.)

B. Analysis

The children and Mother argue the children would suffer detriment with Father due to past domestic violence incidents between Mother and Father, substance use in Father's home, trauma to the girls from negative interactions in Father's home, and the emotional impact of moving to an unfamiliar place with a parent they have not lived with in years. The juvenile court noted those same concerns and relied on *In re C.M., supra*, 232 Cal.App.4th 1394, to conclude that "while the child's wishes, sibling bond, and the child's relationship with the non[-]custodial parent may be considered . . . none of those factors are determinative."

Father acknowledged he was arrested for domestic violence in 2019 after Mother accused him of threatening to kill her, but he denied any intent to cause her actual harm. He also explained that she later retracted her claim. Father's alleged threat was not directed at the children, and his arrest did not result in conviction. Notably, there have been no allegations of violence or abuse by the children or Father's wife, and he has since completed anger management classes. Thus, the evidence relating to the domestic violence allegations does not support a finding of detriment. (*In re C.M., supra*, 232 Cal.App.4th 1394, 1404 [detriment finding not supported when there was "no evidence of any recent, much less current, domestic violence by father"].)

Similarly, Father acknowledged he drank heavily in the past but now only drinks socially. He did not drink when the children were visiting him because he feared it "would probably trigger them." He denied using drugs and explained his employer performs random drug and alcohol testing. His wife attested they did not keep alcohol in their home. The Agency reported "[no] evidence of prior alcoholism" by Father. Taken together, this evidence shows that Father and his wife are aware and mindful of the children's exposure to alcoholism and strive to keep alcohol out of their home and away from the children.

As to the claim that Father's home is unfamiliar and that the children have not lived with him in years, the evidence shows that the children have had multiple visits with Father and to his home. While Father had reduced contact with the children after they moved to San Diego in 2021, visits and communication increased in recent years. In March 2024, Father and C.T. set up a bedroom for the children in their home. In June 2024, the children spent one week with Father in Delaware. In response to the reports of abuse

11

by Mother, in October 2024, Father flew to San Diego to request custody of the children and provide a safe home away from Mother. Over winter break, L.T. spent over one week with Father in Delaware. In January 2025, Father and his wife travelled back to San Diego with L.T. K.T. reported visits with Father "went okay." Throughout this time, Father maintained contact with the children through phone calls and texts. Moreover, K.T.'s therapist noted that sessions with K.T. and Father are "pretty emotional," that they do "a good job listening to each other," and that "they both seem committed [to a better relationship]." Thus, the evidence shows that Father is making strong efforts to maintain contact and build relationships with his daughters.

Although K.T. and L.T. do not want to move to Delaware with Father, they have consistently denied any current safety concerns with him. Mother does not account for the fact that the children's hesitation to living with Father is narrowly focused on potential social isolation, not because of Father himself. As the trial court explained, the children's wishes are important, but they are not determinative. (*In re C.M., supra,* 232 Cal.App.4th at p. 1402; *John M., supra*, 141 Cal.App.4th at p. 1570 [14-year-old's wishes not sufficient].)

Mother, K.T., and L.T. did not meet their burden of proof. Considering the totality of the circumstances, the record contains substantial evidence supporting the court's findings and orders.

## DISPOSITION

The Superior Court's orders are affirmed.

McCONNELL, P. J.

WE CONCUR:


O'ROURKE, J.


IRION, J.