Filed 6/20/23  In re D.H. CA2/6

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## SECOND APPELLATE DISTRICT

## DIVISION SIX

| | |
|---|---|
| In re D.H. et al., Persons Coming Under the Juvenile Court Law. | 2d Juv. No. B320188 (Super. Ct. No. 20JD-00133) (San Luis Obispo County) |
| SAN LUIS OBISPO COUNTY DEPARTMENT OF SOCIAL SERVICES,<br><br>    Plaintiff and Respondent,<br><br>v.<br><br>JANE B. et al.,<br><br>    Defendants and Appellants. | |

Jane B. (mother) and Jeremy H. (Jeremy) appeal from the juvenile court's order removing three children from their physical custody.  The order followed the court's sustaining of a Welfare

and Institutions Code section 387 supplemental petition.[1] Appellants join in each other's appellate briefs. They contend the juvenile court's jurisdictional findings and dispositional order are not supported by substantial evidence. We affirm.

*Factual and Procedural Background*

Appellants are the parents of D.H., who was born in 2014. Mother is also the parent of Z.M., born in 2004, and B.B., born in 2008. Jeremy is not the father of Z.M. or B.B. C.M., the presumed father of Z.M. and B.B., has not filed an appeal. All of the children are female.

In August 2020 a juvenile dependency petition was filed. It alleged that the children came within the jurisdiction of the juvenile court because their parents had failed "to supervise or protect the child[ren] adequately" and "to provide the child[ren] with adequate food, clothing, shelter, or medical treatment." Furthermore, the parents were unable "to provide regular care for the child[ren] due to the parent[s]' . . . mental illness . . . or substance abuse."

According to the petition, on August 18, 2020, a social worker and deputy sheriff visited the home where appellants resided with the children. "The condition of the home posed concern for the health and safety of the children. The home had rat feces throughout the entire house, bugs on the inside of the refrigerator, counters, and on the trash. There was trash and chest height debris scattered throughout the entire home and on the property outside. There were narrow paths to walk throughout the home; however, the home had so much debris that it was nearly impossible to determine the intended purpose

---

[1] Unless otherwise stated, all statutory references are to the Welfare and Institutions Code.

2

for each room.  Some of the rooms were inaccessible due to the debris and trash.  The children presented with dirty skin and clothing, including having an odor."

The petition continued, "There are . . . concerns about the mental health of both parents [Jeremy and mother].  During previous investigations, the parents have discussed being diagnosed with various mental health concerns.  In addition, the parents refused to submit to a drug test during the current investigation, causing concerns for possible substance abuse."

In December 2020 the juvenile court found true the petition's allegations.  The court stated: "[T]here is a preponderance of the evidence that, in fact, . . . the children were living at the [parents'] home, that it was in pretty abysmal condition.  There were rat feces at the time of detention.  There was trash piled chest high.  The children were in poor hygiene . . . and this wasn't the first time that this issue had been reported.  It's not something that came out of the blue.  In fact, those concerns have been there for a long time . . . .  So there's no question I should take jurisdiction of the case and I will, and that will be of all three kids."

The children were adjudged dependent children of the juvenile court within the meaning of section 300, subdivision (b).  The court placed the children "in family maintenance with [mother] and Jeremy."  But it directed "that the place of [family maintenance] is to be at Jeremy's mother's [i.e., D.H.'s paternal grandmother's] house . . . until such time as the appropriate health and land use authorities approve [appellants'] residence to be habita[ble] and then the children can move back in at that residence."

In February 2021 the San Luis Obispo County Department of Social Services (DSS) filed a supplemental petition pursuant to section 387.  This was the first of two section 387 petitions.  The present appeal involves only the second petition.  Section 387, subdivision (a) provides that "[a]n order changing or modifying a previous order by removing a child from the physical custody of a parent . . . and directing placement in a foster home . . . shall be made only after noticed hearing upon a supplemental petition."

The first section 387 petition alleged: "[A]t the last Court hearing on December 16, 2020," mother had stated that "the family home [appellants' residence] would be ready for the children to reside in within two weeks."  "On January 22, 2021, the assigned social worker responded to the parent[s]' home unannounced as she had been unable to make contact with the parents via telephone and text message.  The home was found to be cluttered with boxes, miscellaneous items piled high, broken windows, and the outside of the home continues to be cluttered and overwhelmed with items.  The social worker was not allowed entry into the home.  [Jeremy] confirmed that [mother] and he had been residing in the home since the last Court date, and were only visiting the children every few days.  [Jeremy] admitted that he has been relying on [D.H.'s] paternal grandmother to meet the children's basic needs daily."  The petition requested that "the children remain in the care of the paternal grandmother, and the parents be offered Family Reunification services."

In March 2021 the juvenile court sustained the first section 387 petition.  It found "that the prior disposition was ineffective in family maintenance and that we need a different plan."  It removed the children from appellants' physical custody and "place[d] them where they are right now, in the care of their

4

grandmother." It ordered that family reunification services be provided to appellants.

In September 2021 the juvenile court ordered the children "placed, effective immediately, in the care and custody of" appellants. It directed DSS to "provide family maintenance services." All of the parties agreed to this arrangement.

On April 1, 2022, DSS filed a second section 387 supplemental petition. The petition alleged that the parents had failed to provide the children "with adequate care due to concerns regarding the parents' mental health and possible substance abuse issues." Both parents failed to participate in random drug testing. Jeremy tested positive for THC (tetrahydrocannabinol), "the psychoactive element in marijuana or cannabis." (*People v. Kidane* (2021) 60 Cal.App.5th 817, 823.) In addition, the parents "failed to ensure [the children's] regular[] and consistent attendance at school." The petition was orally amended to allege that the parents did not provide "adequate dental care" for D.H.'s "broken tooth."

DSS's section 387 report, dated April 25, 2022, was prepared by Valerie Amador, a social worker. The parties stipulated "to the expertise of Valerie Amador as a social worker, specifically in the field of family reunification."

According to Amador's report, the children were living with appellants. If the court decided to remove them from the parental home, D.H.'s paternal grandmother "has agreed to take placement of all three children."

The section 387 report emphasized the children's school absences and deficient academic performance: "The children have not been attending school consistently and are grossly behind in their schoolwork." Z.M. "has l0 unexcused absences, 26 truancies

and 5 tardies.  She currently has 1 D, 3 F's, 1 B and 1 A in her classes."  D.H. "has had 35 days of quarantine."

A note from B.B.'s school said, "As of Wednesday, March 30, 2022, [B.B.] has been absent from school for 57 days and present for 77 days.  This is equivalent to [B.B.] being present 57% of the days this school year."  "Of [B.B.'s] 57 absences, [only] 5 of them (3/22-3/28) were excused by a doctor's note."  "[B.B.] currently has 2 Bs, 1 C, 1 D, and 2 Fs with teachers excusing the majority of assignments from when she was absent."

The section 387 report continued: "On March 29, 2022, the mother became escalated when advised of the intent to file a petition to remove the children. . . .  The mother denied that the children had any absences [from school].  When reminded that the school . . . had asked Law Enforcement to do a welfare check due to the number of absences the mother 'exploded' and stated that was 'bullshit' . . . .  The mother continued to yell, walking away . . . and stating that [Amador] just wanted to take the children away."

In an earlier status review report filed on February 14, 2022, Amador noted: "Since returning to the care of [appellants], the children are reportedly sick all the time with different symptoms.  This was never an issue while the children were in foster care [with the paternal grandmother].  [DSS] believes that the children are healthy and that the parents exaggerate many basic health issues."  "The mother has described the children as at risk for autoimmune diseases but [DSS] has not received any documentation to support this information. . . . The children have been tested for COVID-19 several times throughout the review period and have never tested positive."

As to D.H.'s dental problem, the February 14, 2022 status review report said: "[D.H.] has had a broken tooth for many months. The parents finally got her into a dentist in January 2022. Her tooth needs to be removed. The parents report that they do not want a regular dentist taking out her tooth. They state that she needs a specialist who can do the procedure properly and without causing trauma." The section 387 report stated, "[D.H.] had a dental appointment on April 14, 2022, and was referred to a pediatric specialist."

At the hearing on the second section 387 petition, Amador testified as follows: "The concern is [the parents] have not followed through with their court-ordered case plan or with meeting the children's basic needs throughout the past six months." "In this school year, [each of] the children [has] missed 30 to 60 days of school."

"As to [Z.M.], she is missing a lot of assignments." Although Z.M. will soon turn 18, she is not "on track to graduate this year." As of April 26, 2022, "[s]he has three Fs, two Ds, and an A."

B.B. "had been exposed to her family who had COVID in February [2022]. School was fine with her isolating for five days and returning to school; however, the parents kept her home for more than the five days and did not return her to school."

"The children are not going to be able to progress in school if they are not attending regularly." "The children had better grades while they were residing with [the paternal grandmother]."

The school informed Amador that the children have "dirty nails and unkempt hair." Amador personally observed "[t]he

same kind of thing. Just unwashed hair, unkempt nails. . . . Just an uncleanliness, in general."

The children's poor hygiene was a longstanding problem. In October 2019 an unnamed person, designated as "the RP," reported to DSS that "[Z.M.] has very poor hygiene with soiled hair, dirty skin, and dirty clothing that she wears for days at a time. Other children and teachers are noticing, and it is impacting her socially. The RP spoke with staff at . . . School, and they indicated the same for the other children."

As to the parents' participation in random drug testing, Amador testified: "From April 4th [2022] to now [April 27, 2022], mother has tested approximately seven times. Three of those have been negative. Three have been positive for THC. And one test result is currently pending." "[Jeremy] went to Drug and Alcohol on April 4th to test and tested positive for THC. He has missed approximately four tests since then. He is also not calling consistently to see if it is his day to test."

Amador said that, if the children were placed in the paternal grandmother's home, DSS "would offer [appellants] at least three visits per week at the grandmother's home with liberal phone contact."

Jeremy did not testify. Mother testified that she had received a mental health diagnosis of "[b]ipolar disorder and episodes of depression" along with "other specified trauma." In addition, she "suffer[ed] from fibromyalgia, as well as endometriosis and PTSD [Post-Traumatic Stress Disorder]." According to the prior jurisdiction report filed on September 14, 2020, mother "shared that she [had been] diagnosed with . . . Generalized Anxiety Disorder, Social Anxiety, Agoraphobia, and Borderline Personality Disorder."

8

*Juvenile Court's Ruling*

The juvenile court struggled with the issues: "[T]his is an incredibly difficult case, and I've been agonizing it over since I started reading these reports. And the record will reflect that I have read all the reports, all the exhibits. I have heard all the testimony, and I struggled back and forth with this case."

The court found true the second section 387 petition's allegations. In addition, it found that the "previous disposition has not been effective in the protection of the children." The court's decision to remove the children from appellants' physical custody was based on the totality of the circumstances: "[E]ach of these problems taken independently would not rise to a [section] 300 [dependency] petition. . . . I've seen many cases with dirty houses. I've seen many cases where the parents have drug issues. I've seen many cases where the kids are not in school. I've seen cases where the kids are not getting adequate medical information and medical and dental care. [¶] It's a neglect case. . . . There's mental illness. There's truancy. And there's lack of cooperation. And so the answer is that . . . all these things taken together . . . rise to the level of removal, not any one of them. [¶] And the kids are at risk. . . . And I know the kids don't want to leave their parents. And so the recommendation is to go to [the paternal grandmother] until the end of school and then to stay in family reunification. So family reunification is still possible."

The court expressed concern that Jeremy was not participating in random drug testing: "I am concerned that dad is not testing. I don't know whether that's paranoia or drug use. He is not cooperating. He needs to cooperate."

9

The court also expressed concern about D.H.'s broken tooth: "I don't know what's going on with [D.H.'s] tooth. It needs to be resolved . . . . And it's another one of those things that just adds another layer to this case."

The court concluded by declaring: "And so I am going to follow the recommendations of [DSS]. And I will state for the record that all of these findings are made by clear and convincing evidence . . . ."

*DSS Has Not Shown that the*
*Issues Regarding Z.M. Are Moot*

Without citing supporting authority, DSS contends, "The issues regarding Z.[M]. are moot, as she is now an adult." DSS offers no further explanation why the issues regarding Z.M. are moot.

It does not follow that these issues are moot merely because Z.M. attained the age of majority during the appeal. In December 2020 Z.M. was adjudged a dependent child of the juvenile court. At that time, she was 16 years old. She will not turn 21 until 2025. The juvenile court may retain jurisdiction over her until her 21st birthday. (§ 303, subd. (a).) "[W]hen a juvenile court *has* assumed jurisdiction over a person, the person's 18th birthday does not divest the court of jurisdiction and does not necessarily render moot an appeal from an order entered in the dependency proceedings." (*In re David B.* (2017) 12 Cal.App.5th 633, 651-652, disapproved on other grounds in *In re D.P.* (2023) 14 Cal.5th 266, 283; see *In re Ruth M.* (1991) 229 Cal.App.3d 475, 480, fn. 4 ["Ruth reached the age of 18 in November 1990, during the pendency of this appeal. However, it is necessary for this court to review the order as it affects the

10

rights of the parties as of the time it was made; the appeal is not moot"].)

On the other hand, "a parent cannot have 'physical custody' of a dependent child who has turned 18." (*In re K.L.* (2012) 210 Cal.App.4th 632, 642.) Family Code section 7505, subdivision (c) provides: "The authority of a parent ceases on . . . [t]he child attaining the age of majority."

Irrespective of whether the appeal as to Z.M. is moot, we have discretion to decide the issues pertaining to Z.M.: "Given the short timeframes associated with dependency cases and the potentially significant, if sometimes uncertain, consequences that may flow from jurisdictional findings, consideration of the overarching purposes of the dependency system may counsel in favor of reviewing a parent's appeal despite its mootness." (*In re D.P.*, *supra*, 14 Cal.5th at pp. 286-287.)

*Jurisdictional and Dispositional Phases of a*
*Section 387 Supplemental Petition Proceeding*

"A section 387 supplemental petition is used to change the placement of a dependent child from the physical custody of a parent to a more restrictive level of court-ordered care. [Citations.] In the jurisdictional phase of a section 387 proceeding, the court determines whether the factual allegations of the supplemental petition are true and whether the previous disposition has been ineffective in protecting the child. (§ 387, subd. (b); [Cal. Rules of Court,] rule 5.565(e)(1).) If the court finds the allegations are true, it conducts a dispositional hearing to determine whether removing custody is appropriate. [Citations.] A section 387 petition need not allege any new jurisdictional facts, or urge different or additional grounds for dependency because a basis for juvenile court jurisdiction already

11

exists. [Citations.] The only fact necessary to modify a previous placement is that the previous disposition has not been effective in protecting the child." (*In re T.W.* (2013) 214 Cal.App.4th 1154, 1161.)

*Substantial Evidence Supports the*
*Juvenile Court's Jurisdictional Findings*

Appellants contend substantial evidence does not support the juvenile court's jurisdictional findings, i.e., the findings that the factual allegations of the section 387 petition are true and that the previous disposition has not been effective in protecting the children. "On appeal from an order making jurisdictional findings, we must uphold the court's findings unless, after reviewing the entire record and resolving all conflicts in favor of the respondent and drawing all reasonable inferences in support of the judgment, we determine there is no substantial evidence to support the findings. [Citation.] Substantial evidence is evidence that is reasonable, credible, and of solid value." (*In re Veronica G.* (2007) 157 Cal.App.4th 179, 185.) "Thus, in order to succeed on appeal, [appellants] must demonstrate that there is no evidence of a sufficiently substantial nature to support the court's [jurisdictional findings]." (*In re K.B.* (2015) 239 Cal.App.4th 972, 979.) "Issues of fact and credibility are the province of the juvenile court and we neither reweigh the evidence nor exercise our independent judgment." (*In re Yolanda L.* (2017) 7 Cal.App.5th 987, 992.)

The petition alleged, "The previous disposition has not been effective in the protection or rehabilitation of the child[ren]." "The children . . . continue to be at risk and/or suffer serious emotional harm or illness as a result of the failure or inability of the parent[s] to provide the children with adequate care due to

12

concerns regarding the parents' mental health and possible substance abuse issues." Both parents failed to participate in random drug testing. Jeremy tested positive for THC. The parents "failed to ensure [the children's] regular[] and consistent attendance at school and . . . failed to appropriately and adequately address their educational needs." The petition was amended to also allege that the parents had failed "to get adequate dental care" for D.H.'s "broken tooth."

Substantial evidence supports the juvenile court's finding that the petition's allegations are true. Jeremy refused to participate in random drug testing. The two tests he took were positive for THC. "Prior to the filing of the [second section] 387 petition on April [1], 2022, [mother] had failed to follow through with the 60 days of random drug testing that was ordered in November 2021." Upon the filing of the second section 387 petition, she began participating in random drug testing. But her record was dismal – of the six tests she had taken in April 2022, three were positive for THC.

As to mother's mental health, she admitted that she had been diagnosed with various mental disorders. It is reasonable to infer that serious mental health issues and substance abuse contributed to the deplorable, chaotic condition of the parental home in August 2020 and thereafter. The unhealthy home environment posed a substantial danger to the children's physical and emotional well-being. "[E]vidence of past conduct may be probative of current conditions." (*In re Yolanda L, supra,* 7 Cal.App.5th at p. 993.)

In August 2020 a social worker and a deputy sheriff inspected appellants' home. Prior to the inspection, DSS received a report that appellants "are hoarders, and that the outside of the

13

property is 'a mess.'" At the time of the inspection, the home was filthy and in extreme disarray. "Social Worker Webb observed the entirety of the front yard to be completely covered with trash, junk, and random items filled anywhere from knee height to shoulder height. There was a narrow path that led from the front yard to the front door of the home." Upon entering the home, Webb "observed chest high piles of trash and debris." "All of the rooms throughout the house were filled with trash and debris. It was difficult to discern what each room was used for, because they were so cluttered with trash and debris." "Most of the rooms . . . were inaccessible due to the excessive amounts of trash and debris. The bathroom appeared to be unusable, other than the toilet due to how much trash and random items were on the counters." "Throughout the home, flies and various bugs were present; . . . Rat droppings were visible throughout the entire home, but were especially present in the kitchen in which the counters were covered with rat droppings."

Appellants "moved into [the] home two years" before Webb inspected it in August 2020. The home was still in a state of extreme disarray on January 22, 2021, when "the assigned social worker responded to the . . . home unannounced as she had been unable to make contact with the parents via telephone and text message." The "social worker noted that the home continues to be cluttered with boxes and miscellaneous items stacked high, broken windows, and [the] outside [of] the home continue[s] to be cluttered and overwhelmed with items." Appellants did not allow the social worker to enter the home.

The condition of the inside of the home had improved by the time of the status review report filed on February 14, 2022, but the outside remained in a state of disarray: "Upon arrival to

14

the home, the outside presents as very dirty, cluttered, and full of trash.  However, there is a clear walkway to the front door and into the home.  The inside of the home has clear pathways to each room of the house and the exits are easily accessible."

The section 387 report said that on March 23, 2022, approximately one month before the section 387 hearing, Deputy Sheriff Lomeli told Amador that she and a school official had gone "to the family's home to speak to the parents and children," but "no one answered the door.  Deputy Lomeli expressed concern [to Amador] about the children's absences [from school] and *the condition of the home.*  Deputy Lomeli reported that the neighbor reported that he had not seen the children in weeks and that the family did not have electricity."  (Italics added.)

As to the education issue, without good cause and despite the protests of school authorities and DSS, appellants engaged in a pattern of not sending the children to school.  The children had numerous unexcused absences.  The results were disastrous.  The children were unable to keep up with their school work and had poor or failing grades.  "Failing to attend school regularly not only deprives the children of an education, but also of the social interaction and 'peer relationships necessary for normal growth and development' . . . .  It is a very serious allegation and a factual circumstance which needed immediate correction. . . .  The lack of education may well cause psychic or emotional or financial or social harm."  (*In re Janet T.* (2001) 93 Cal.App.4th 377, 388-389.)

Amador personally observed the "uncleanliness" of the children.  The school complained that they had "dirty nails and unkempt hair."

Finally, appellants procrastinated in attending to D.H.'s dental needs. For months they delayed the extraction of her broken tooth. As of April 27, 2022, when Amador testified at the hearing on the second section 387 petition, the tooth had not yet been extracted.

""The ultimate test [for substantial evidence] is whether it is reasonable for a trier of fact to make the ruling in question in light of the whole record.". . .'" (*In re Yolanda L.*, *supra*, 7 Cal.App.5th at p. 992.) Considering the totality of the circumstances, we conclude the juvenile court reasonably determined that the petition's allegations were true and that "the previous disposition [had] not been effective in the . . . protection of the child[ren] . . . ." (§ 387, subd. (b).)

*Substantial Evidence Supports the*
*Juvenile Court's Dispositional Order*

Appellants claim that substantial evidence does not support the juvenile court's dispositional order removing the children from their physical custody. "The standard for removal on a supplemental petition is the same as removal on an original petition: the agency must show by 'clear and convincing evidence . . . [t]here is a substantial danger to the physical health, safety, protection, or physical or emotional well-being of the minor' if left in parental custody 'and there are no reasonable means by which the minor's physical health can be protected without removing the minor from [parental] physical custody.' (§ 361, subd. (c)(1); [citation].)" (*Kimberly R. v. Superior Court* (2002) 96 Cal.App.4th 1067, 1077.)

"When reviewing a finding that a fact has been proved by clear and convincing evidence, the question before the appellate court is whether the record as a whole contains substantial

16

evidence from which a reasonable fact finder could have found it highly probable that the fact was true.  In conducting its review, the court must view the record in the light most favorable to the prevailing party below and give appropriate deference to how the trier of fact may have evaluated the credibility of witnesses, resolved conflicts in the evidence, and drawn reasonable inferences from the evidence." (*Conservatorship of O.B.* (2020) 9 Cal.5th 989, 1011-1012.)

"'A removal order is proper if it is based on proof of (1) parental inability to provide proper care for the minor and (2) potential detriment to the minor if he or she remains with the parent.' [Citations.]  It is not required that the parent be dangerous or that the child have been harmed before removal is appropriate.  [Citation.]  'The focus of the statute is on averting harm to the child.'" (*In re D.D.* (2019) 32 Cal.App.5th 985, 996.) "'"The court may consider a parent's past conduct as well as present circumstances. . . ."'" (*In re A.F.* (2016) 3 Cal.App.5th 283, 292.)

As required, we view the record in the light most favorable to DSS.  For the reasons discussed in the preceding section on the juvenile court's jurisdictional findings, we conclude the record as a whole contains substantial evidence from which a reasonable fact finder could have found it highly probable that: (1) appellants were "unable to provide proper care for the children and that they would be at risk of harm if they remained in [appellants'] custody" (*In re D.D.*, *supra*, 32 Cal.App.5th at p. 996); and (2) there were not "any reasonable protective measures and services that [could] be put into place to prevent the [children's] removal from the parent[s'] physical custody." (*In re Maria R.* (2010) 185 Cal.App.4th 48, 70, disapproved on other

17

grounds by *In re I.J.* (2013) 56 Cal.4th 766, 780-781.)  DSS carried its burden of showing by clear and convincing evidence that "[t]here is or would be a substantial danger to the physical health, safety, protection, or physical or emotional well-being of the [children] if [they] were returned home, and there are no reasonable means by which [their] physical health can be protected without removing the [children] from the . . . parent[s'] . . . physical custody."  (§ 361, subd. (c)(1).)

### Disposition

As to the second section 378 supplemental petition filed on April 1, 2022, the juvenile court's jurisdictional findings and dispositional order are affirmed.

NOT TO BE PUBLISHED.

YEGAN, J.

We concur:

GILBERT, P. J.

BALTODANO, J.

Margaret Johnson, Judge

Superior Court County of San Luis Obispo

_____

Paul A. Swiller, under appointment by the Court of Appeal, for Defendant and Appellant, Jeremy H.

Roni Keller, under appointment by the Court of Appeal, for Defendant and Appellant, J.B.

Rita L. Neal, County Counsel, Ann Duggan, for Respondent.