Filed 2/14/25  In re D.C. CA1/2

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION TWO

| | |
|---|---|
| In re D.C., a Person Coming Under the Juvenile Court Law. | |
| ALAMEDA COUNTY SOCIAL SERVICES AGENCY,<br><br>     Plaintiff and Respondent,<br><br>v.<br><br>D.C., a Minor,<br><br>     Defendant and Appellant. | A170510<br><br>(Alameda County Super. Ct. No. JD03687701) |

After a contested jurisdiction and disposition hearing, the juvenile court declared dependency over D.C., ordered him removed from his mother's custody, and granted his father physical and legal custody.  D.C. appeals, arguing the court erred by failing to conform the petition to proof to include an allegation against father and by finding no detriment to D.C. in being released to father.  We affirm.

## BACKGROUND

On November 3, 2023, D.C.'s mother was pulled over in an area known for high drug activity.  D.C., then three years old, was asleep in the back of the vehicle.  The police discovered marijuana and methamphetamine within

1

reach of D.C. Mother was subsequently arrested for drug sales and child endangerment.

D.C. has three half siblings: A.G., F.G., and S.G. D.C. was turned over to the care of his adult sibling, S.G., who was already caring for D.C.'s two other juvenile siblings, A.G. and F.G.

On November 7, 2023, the Alameda County Social Services Agency (Agency) filed a petition pursuant to Welfare and Institutions Code[1] section 300 for all three juvenile children, D.C., A.G., and F.G. Pursuant to section 300, subdivision (b)(1), the petition alleged the children suffered, or there was a substantial risk that the children would suffer, serious physical harm or illness as a result of mother's inability to provide regular care for the children due to her substance use. The petition also alleged that D.C. had been left without any provision for support under section 300, subdivision (g) because father's whereabouts and ability to care for D.C. were unknown at the time. The next day, the juvenile court held a detention hearing, ordered all three children detained, and directed the Agency to conduct a formal search for father.

On November 15, 2023, the Agency filed an amended petition to correct the spelling of the name of A.G.'s and F.G.'s father. On January 5, 2024, the Agency filed a second amended petition, correcting the spelling of D.C.'s and his father's names and removing reference to father's location being unknown. The Agency had located D.C.'s father in Florida and communicated with him. Father had initially denied paternity of D.C. but later acknowledged D.C. to be his child. Father requested custody of D.C., explaining that he was present at D.C.'s birth, was listed as the father on

---

[1] All undesignated statutory references are to the Welfare and Institutions Code. A.G. and F.G. are not parties to this appeal.

D.C.'s birth certificate, and D.C. knew him as "daddy." The Agency noted in its jurisdiction/disposition report that it needed more time to assess father to determine whether D.C. would be safe in father's care and was worried because father initially denied paternity.

On January 8, 2024, the juvenile court held a hearing where it questioned mother regarding D.C.'s paternity. Mother testified that father was present at the hospital when D.C. was born, was named as father on the birth certificate, lived with her for about six months from the time when D.C. was about four months old to 10 months old, and always held D.C. out as his child. The court deferred ruling on paternity and continued the matter to allow father to address the issue.

Later that month, father submitted a statement regarding parentage in which he stated that he believed he was D.C.'s father, regularly visited and spent time with D.C. from D.C.'s birth until father's August 2022 move to Florida, and provided money, clothes, and food for D.C. during that time. At the next hearing, after receiving father's statement regarding parentage and a copy of D.C.'s birth certificate naming father, the juvenile court elevated father to presumed father status. The court continued the matter for a contested hearing the following month based on the Agency's request for more time to assess father's Florida home for potential placement of D.C.

Before the next hearing, the Agency filed a third amended petition, removing the section 300, subdivision (g) allegation as to father and reflecting his presumed father status. The Agency also submitted an addendum report, recommending that the juvenile court find the third amended petition to be true, that the dependency case regarding D.C. be dismissed, and that D.C. be released to father's care.

In the report, the Agency noted the following: father continued to express his desire to have D.C. released to his care so he could provide D.C.

with stability; father lost contact with mother and D.C. before moving to Florida but had last visited D.C. in December 2022; D.C. had never lived with father; father had a criminal record in California from 1993 to 1998 and was arrested several times in Massachusetts between 2003 and 2006; father reported being clean from drugs for roughly 20 years, and the local county sheriff in Florida reported no arrests for father; the Agency's child welfare worker traveled to Florida to assess father's home and found no safety concerns; father indicated he would support D.C.'s transition to his home by facilitating regular phone and video calls with D.C.'s siblings to maintain their connection.

On February 20, 2024, the juvenile court ordered supervised visitation with therapeutic input for father and D.C. and set the matter for contest the following month.

The contested hearing took place over the course of four days from March through May 2024. On the first day of the hearing, the Agency's counsel advised the juvenile court that prior to the case being called, it had discussions with D.C.'s counsel, A.G., and F.G. regarding their concerns of substance abuse by father. D.C.'s counsel sought to have the petition amended to add an allegation against father based on his substance use. The Agency's counsel stated that the Agency had conducted a search of father's criminal history and believed any substance use was too attenuated to present a current risk to D.C. and therefore the Agency had decided not to amend the petition.

D.C.'s counsel sought to present testimony from D.C.'s siblings to show that father's substance use was not attenuated, despite the petition's absence of related allegations against father. The court allowed the testimony, advising the parties, "I will deal with those objections as they come." A.G. and F.G. both testified that father had offered them marijuana when visiting

4

mother and D.C. in December 2022. But the court noted non-verbal communication between A.G. and F.G. when A.G. was testifying and expressed concern over their credibility, resulting in the exclusion of F.G. during the second day of A.G.'s testimony. Later, S.G., D.C.'s eldest sibling and temporary guardian, testified that she visited mother when D.C. was a few months old and saw mother, father, and other people in the garage playing cards and smoking cigarettes; she observed a clear glass pipe in mother's bra or being held by others.

The Agency's child welfare worker testified that D.C.'s therapist preferred D.C. stay with his siblings, not because of an issue with father or his residence but because, "[s]he had a concern about [D.C.] having to experience a transition from familiarity to something new and how that could impact him emotionally." "[A]t the very least," she recommended, "a longer transition" to develop familiarity before being placed in the care of father.

Between the first and second hearing dates, the Agency applied for, and the juvenile court granted, an ex parte order to arrange an overnight home visit between D.C. and father to familiarize D.C. with father's residence in Florida in anticipation of a potential release to father. When the hearing resumed on the second day, the Agency's child welfare worker testified that the visit went well: D.C.'s sleep and eating habits were not disrupted, D.C.'s general behavior seemed normal, D.C. transitioned out of the visit well, and D.C. said that he loved living with father. The child welfare worker also testified that he was concerned about dragging out the process with numerous visits to Florida to stay with father overnight and offered to support D.C. and father through the transition by connecting D.C. with services and keeping him connected with his siblings.

At the end of the third day of the hearing, the court ordered the Agency to arrange another visit to father's home. At the fourth and final day of the

5

hearing, the Agency's child welfare worker testified regarding the second visit to father's home, stating he had no concerns about D.C.'s reaction to father, the condition of father's home, or father's ability to immediately care for D.C. S.G. testified that D.C. came back dirty after his visits with father and D.C. told her that he did not like to visit father and did not want to go back, crying before leaving for the second visit.

At the conclusion of testimony, D.C.'s counsel argued the petition should be conformed to proof to include an allegation against father under section 300, subdivision (b) for failure to protect D.C. from mother's substance use and unsafe living conditions. Counsel also argued that it would be detrimental to D.C.'s emotional well-being to be immediately placed with father because moving away from his siblings would have a "devastating emotional impact" on D.C. based on their strong bonds. She instead requested family reunification services and a thoughtful transition to father's care.

The juvenile court concluded that there was insufficient evidence to conform the petition to proof by adding a failure to protect allegation against father. The court further explained, "this is not a placement. . . . I would be placing the child with a non-offending parent, but it's not a placement. . . . [W]e don't look at a parent's home as a placement. It may be a noncustodial parent that we're releasing the child to, but that's very different." "I cannot treat a non-offending parent, who was a noncustodial parent, as if I would treat a foster parent. That's a little different analysis."

As such, the court found no detriment in releasing D.C. to father's care: the therapist did not find that it would be detrimental to do so and the siblings' testimony on recent substance use was not helpful or credible. The court accepted the Agency's recommendation to place D.C. with father and dismissed the dependency petition.

6

**DISCUSSION**

D.C. raises two issues on appeal: (1) the juvenile court abused its discretion by denying the request to conform the petition to proof to include an allegation against father for failing to protect D.C. from mother's conduct under section 300, subdivision (b)(1); and (2) the court erred in finding no detriment to D.C. in releasing him to father and dismissing the case. We disagree.

**A.** *Refusal to Conform the Petition to Proof Is Not Error*

"A juvenile court may amend a dependency petition to conform to the evidence received at the jurisdiction hearing to remedy immaterial variances between the petition and proof. (§ 348; Code Civ. Proc., § 470.)" (*In re I.S.* (2021) 67 Cal.App.5th 918, 927 (*I.S.*).) "Indeed, such amendments are favored in the dependency context, in light of the 'haste with which petitions are sometimes drafted, and section 332's statement that only a "concise statement of facts is required" . . . .' (*In re Jessica C.* (2001) 93 Cal.App.4th 1027, 1041–1042 [citation].) But '[i]f a variance between pleading and proof . . . is so wide that it would, in effect, violate due process to allow the amendment, the court should, of course, refuse any such amendment.' " (*In re G.B.* (2018) 28 Cal.App.5th 475, 485–486 (*G.B.*).) Thus, "amendments according to proof should not be denied 'unless the pleading as drafted prior to the proposed amendment would have misled the adversarial party to its prejudice.' " (*In re S.V.* (2022) 86 Cal.App.5th 1036, 1048 (*S.V.*), citing *In re Jessica C.*, at p. 1042.)

But " '[T]he allowance of amendments to conform to the proof rests largely in the discretion of the trial court and its determination will not be disturbed on appeal unless it clearly appears that such discretion has been abused.' " (*I.S.*, *supra*, 67 Cal.App.5th at p. 927.)

7

In support of its argument that the court should have allowed amendment of the petition, D.C. relies on *In re A.R.* (2014) 228 Cal.App.4th 1146, in which the court of appeal affirmed the trial court's finding of failure to protect under section 300(b)(1)(B) where, "mother left the minors with father despite her knowledge of father's drug use and then made minimal efforts to regain custody." (*In re A.R.*, at p. 1149.) But *A.R.* is inapposite. First, the issue decided was whether there was substantial evidence to support the court's finding, not whether the petition should have been amended to conform to proof.[2] Second, the facts are significantly distinguishable. The mother in *A.R.* "admitted that she knew about father's long-standing history of substance abuse. Because father frequently beat her, she clearly knew that he was violent and physically abusive. . . . He stalked and threatened mother and she was by her own admission scared to death of him. In one [Department of Children and Family Services] report she admitted that she 'knew something like this would happen.'[3] Despite this, she gave up trying to see the girls after one unsuccessful request for help from the police and moved out of state, where she started a new family with another man." (*Id.* at pp. 1152–1153.) Conversely, here we only have minimal and ambiguous evidence of father's knowledge of mother's drug use

---

[2] In fact, the Court of Appeal alternatively noted that, even though mother had forfeited any claim to challenge the pleadings, "[m]other was on notice of the failure-to-protect issue by way of a DCFS report, which stated that she failed to take sufficient steps to regain custody of the minors, thereby allowing father to create a 'detrimental and dangerous living environment' leading to neglect and sexual abuse by the father." (*In re A.R.*, *supra*, 228 Cal.App.4th at pp. 1153–1154.)

[3] Acknowledging the possibility of father's sexual assault of the children, which was one of the bases found for their removal from father's custody. (*In re A.R.*, *supra*, 228 Cal.App.4th at p. 1149.)

before his move to Florida,[4] and no evidence of father's knowledge of severe substance abuse or of physical or sexual assault.

As D.C.'s absence of cited authority suggests, our independent review of case law supports the juvenile court's refusal to amend. For example, the court of appeal in *I.S.* held the juvenile court had abused its discretion in allowing a request to conform to proof to add allegations under a theory of emotional abuse rather than the physical abuse alleged in the original petition. (*I.S.*, *supra*, 67 Cal.App.5th at p. 929.) Permitting amendment of the petition was error because the allegations "materially varied from the original petition to Mother's detriment." (*Id.* at pp. 929–930.) As such, "Mother had no notice evidence should be presented concerning the nature and severity of any emotional damage I.S. may have been suffering, as well as Mother's responsibility for the initial onset and continuation of I.S.'s emotional damage." (*Id.* at p. 929.)

Similarly, in *G.B.*, the juvenile court abused its discretion in amending the petition to conform to proof "to assert allegations against father based on a factual and legal theory not at issue in the original petition." (*G.B.*, *supra*, 28 Cal.App.5th at p. 486.) Specifically, the added allegations sought to "establish jurisdiction . . . under a different legal theory than the original allegations (emotional abuse versus sexual abuse); they named father as an offending parent even though he was nonoffending in the original petition; and they were based on a set of facts not at issue in the original allegations." (*Ibid.*)

Likewise, in *S.V.*, the juvenile court abused its discretion by amending the petition to include an allegation against the nonoffending mother,

---

[4] As the trial court explained, "I still don't have any real indication that he was involved with the mother while using drugs."

asserting facts and theories not alleged in the original petition. (*S.V.*, *supra*, 86 Cal.App.5th at pp. 1048–1049.) Despite minor's counsel's consistent and clear advocacy to conform the petition to include separate allegations against the mother, the court found it was insufficient to apprise the mother "that allegations were being asserted against her, or of the specific details of the allegations ultimately sustained by the juvenile court." (*Id.* at p. 1050.) The court found additional support in that the agency opposed the proposed amendment offered by minor's counsel. (*Ibid.*)

Here, as in *I.S.*, *G.B.*, and *S.V.*, the request to conform includes new allegations that are materially different from those in the original petition, including a different factual and legal theory not previously at issue. In the third amended petition, the operative petition at the time of the contested hearing, father was a nonoffending parent, and jurisdiction was based on mother's endangerment of D.C. Father's conduct was not at issue. Adding an allegation against father for failure to protect would have violated father's due process rights as it gave father no notice that the petition could be sustained based on his failure to protect D.C. from mother's substance abuse rather than mother's own conduct. Thus, we conclude the juvenile court did not abuse its discretion in denying D.C.'s counsel's request to conform the petition to proof by adding allegations of father's failure to protect D.C.

## B. *Release to Father Is Not Detrimental to D.C.*

Section 361.2, subdivision (a) requires a court ordering removal of a child to first determine whether there is a noncustodial parent who wants to assume custody. The court shall place the child with that parent, unless that placement would be detrimental to the child's safety, protection, or physical or emotional well-being. (§ 361.2, subd. (a).) A finding of detriment under section 361.2, subdivision (a) must be based on clear and convincing evidence. (*In re Luke M.* (2003) 107 Cal.App.4th 1412, 1426.) "In making this finding,

10

the court weighs all relevant factors to determine if the child will suffer net harm." (*In re A.C.* (2020) 54 Cal.App.5th 38, 43 (*A.C.*).) "It is the burden of the party or parties opposed to such placement to prove detriment." (*In re K.B.* (2015) 239 Cal.App.4th 972, 979.)

We generally review a juvenile court's disposition order under the substantial evidence standard. (*In re K.B.*, *supra*, 239 Cal.App.4th at p. 979.) Where, as here, "the trier of fact has expressly . . . concluded that the party with the burden of proof did not carry the burden and that party appeals, it is misleading to characterize the failure-of-proof issue as whether substantial evidence supports the judgment." (*In re I.W.* (2009) 180 Cal.App.4th 1517, 1528, disapproved on another ground in *Conservatorship of O.B.* (2020) 9 Cal.5th 989, 1010, fn. 7.) "[W]here the issue on appeal turns on a failure of proof at trial, the question for a reviewing court becomes whether the evidence compels a finding in favor of the appellant as a matter of law. [Citations.] Specifically, the question becomes whether the appellant's evidence was (1) 'uncontradicted and unimpeached' and (2) 'of such a character and weight as to leave no room for a judicial determination that it was insufficient to support a finding.' " (*In re I.W.*, at p. 1528; see also *In re Raul V.* (2022) 82 Cal.App.5th 290, 293.)

D.C. argues there was substantial evidence to support a finding that placement with father would be detrimental due to D.C.'s bond with his siblings, absence of relationship with father, and the recommendations of his therapist. We disagree.

To support his argument for detriment, D.C. relies solely on *A.C.* There, the juvenile court held that placement of a 12-year-old minor with her out-of-state father would be detrimental because she "would experience something akin to trauma." (*A.C.*, *supra*, 54 Cal.App.5th at pp. 40, 43.) A.C. was strongly attached to her maternal family, including a half brother, was

11

thriving in her grandmother's home, saw her mother daily and wanted to reunify, excelled academically, and feared going to live with her father—a practical stranger whom she had not heard from in over five years. (*Id.* at pp. 43–44.) A.C. had severe anxiety about living with her father and was unable to sleep; her therapist concluded that removing her "from her half brother and the only family she has known in this way would be detrimental to her mental health." (*Id.* at p. 44.) A multidisciplinary assessment team agreed placing A.C. with her father " 'would cause emotional detriment,' " concluding her " 'social-emotional needs are vulnerable,' " and "[s]he is 'at high risk of emotional deterioration.' " (*Id.* at p. 41.) The appellate court affirmed, holding that the evidence amply supported the juvenile court's finding that A.C. would suffer emotional detriment if placed with her father. (*Ibid.*)

*A.C.* does not support D.C.'s contentions. First, we are in a different procedural posture. The juvenile court in *A.C.* made a finding of detriment, thus, on appeal, the "deferential" task for the reviewing court was to determine if there was substantial evidence supporting the juvenile court's finding. (*A.C.*, *supra*, 54 Cal.App.5th at pp. 42–43.) By contrast, the court here found no detriment, thus, the only opportunity for reversal is if there is " 'no room for a judicial determination that [the evidence] was insufficient to support a finding.' " (*In re I.W.*, *supra*, 180 Cal.App.4th at p. 1528.) As explained above, it was D.C.'s burden to show detriment by clear and convincing evidence. Having failed to meet that initial burden, the burden on appeal is even higher. (*Ibid.*)

Second, *A.C.* is factually distinguishable. As noted, 12-year-old A.C. was strongly attached to her maternal family and sought reunification with her mother. She was thriving socially and in school, yet the thought of living with her father, a stranger, caused her severe anxiety and emotional distress.

12

As a result, both her therapist and a multidisciplinary assessment team concluded that having the minor move in with her father would cause her emotional detriment. (*A.C.*, *supra*, 54 Cal.App.5th at pp. 41–45.)

Here, in contrast, D.C. had positive experiences with father, having two successful overnight trips to Florida while maintaining healthy sleeping and eating habits. In fact, D.C. "said that he loved living with his dad, that he didn't want to leave." While D.C. has never lived with father before, father was generally present in D.C.'s first year when he regularly visited and provided support. D.C. knew father as "daddy."

D.C. does have strong ties to his half siblings, but no evidence was presented that moving D.C. from his half sister's home would cause "emotional detriment." Although D.C.'s therapist preferred that D.C. stay with his siblings and expressed concern that a move without sibling contact would cause D.C. "a devastating emotional impact," she also recommended "a longer transition" to mitigate any potential harm. Moreover, unlike in *A.C.*, no expert assessment was conducted or introduced into evidence, as D.C.'s counsel acknowledged.[5] In fact, D.C.'s counsel conceded this absence of evidence when questioned by the court: "And let me just clarify, that detriment is based upon what? I don't have a therapist saying that this would be detrimental to this child to go to his father. Just that it should be a thoughtful process, correct?" Counsel responded, "And I -- yes." Similarly, towards the end of the hearing, D.C.'s counsel clarified, she was not seeking a termination of father's parental rights but rather a slower reunification: "[M]y argument is not that [D.C.] should not be going at some point to his

_____

[5] "Notably what is also missing from any and all reports in this case is an assessment by the Agency of the factual assessments required under . . . [section] 358.1[, subdivision] (d), specifically as to the sibling relationship."

13

father's home.  I'm asking that there be a thoughtful transition based on what has been before the court, and that at the present time it would be detrimental to [D.C.]."

Additionally, father's represented interest in fostering an ongoing connection between D.C. and his half siblings and securing therapeutic resources for D.C., further demonstrate the stark differences between the instant case and *A.C.*  Taken as a whole, the trial court's finding of no detriment in releasing D.C. into father's care is firmly supported by the record.

## DISPOSITION

The judgment is affirmed.

_____

DESAUTELS, J.

We concur:

_____

RICHMAN, ACTING P. J.

_____

MILLER, J.

*In re D.C.* (A170510)