Filed 5/1/25  In re T.N. CA4/3

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b). This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FOURTH APPELLATE DISTRICT

## DIVISION THREE

| | |
|---|---|
| In re T.N., a Person Coming Under the Juvenile Court Law. | |
| ORANGE COUNTY SOCIAL SERVICES AGENCY, Plaintiff and Respondent, v. E.N. et al., Defendants and Appellants. | G064851 (Super. Ct. No. 24DP0591) O P I N I O N |

Appeals from orders of the Superior Court of Orange County, Daphne Grace Sykes, Judge. Dismissed as to Defendant and Appellant E.N. Affirmed as to Defendant and Appellant J.H.

David Dickey, under appointment by the Court of Appeal, for Defendant and Appellant E.N.

Sarah Vaona, under appointment by the Court of Appeal, for Defendant and Appellant J.H.

Leon J. Page, County Counsel, Debbie Torrez and Aurelio Torre, Deputy County Counsel, for Plaintiff and Respondent.

No appearance by the Minor.

\*　　　　\*　　　　\*

E.N. (Mother) and J.H. (Father) appeal orders declaring their son, T.N., a dependent of the juvenile court and maintaining his placement with his maternal aunt. Targeting the disposition order, Father contends the court prejudicially erred by applying the wrong legal standard in denying his request to have T.N. placed in his care. We disagree and affirm that order. Mother appealed various orders of the court, but her appellate attorney filed a brief stating he was unable to find any issues to argue on appeal and asking us to independently review the record for possible error as to Mother. We decline that request and dismiss Mother's appeal.

STATEMENT OF FACTS

I.

EVENTS LEADING UP TO T.N.'S DETENTION

This case has its roots in South Carolina, where T.N. was born in 2016. At that time, Mother and Father were unmarried and separated. They remained estranged the first few years following T.N.'s birth, and Father had virtually no contact with T.N. during that period. When T.N. was about four

2

years old, however, Father took care of him for a week or two while Mother was receiving treatment at a mental health facility in South Carolina.[1]

Upon leaving the facility, Mother lived with Father and T.N. in South Carolina for a few months. But one evening in 2021, she absconded with T.N. in the middle of the night and took him to California. Father called Mother repeatedly to find out where she was, but his calls went unanswered. He did not learn Mother's whereabouts or talk to T.N. again until this case arose in 2024.[2]

As a single parent with mental health issues, Mother had a hard time when she arrived in Southern California. She was able to reach out to her mother and her sister, as well as other relatives who live in the area, and at first they were willing to take her and T.N. into their homes and help them. Over time, however, they developed concerns about Mother's mental health and drug use. When they confronted Mother with those concerns, she became defensive and accused them of sexually abusing T.N. as part of a pedophilia ring. This caused a huge rift between Mother and her family. It also left Mother and T.N. without a place stay. They ended up going from shelter to shelter until Mother was able to obtain a housing voucher for an apartment in Huntington Beach in early 2024.

---

[1] The record does not disclose why Mother was treated at that time, but in this case, she reported she suffers from posttraumatic stress disorder (PTSD), attention deficit hyperactivity disorder (ADHD), anxiety, and major depression. She also admitted she had a drug problem in the past and is currently taking a variety of prescription medications for her various mental issues.

[2] According to a 2020 South Carolina family court order, Father shares legal custody of T.N. with Mother. He did not, however, seek legal recourse after Mother ran away with their child.

3

By that time, T.N., who has autism and speech issues that significantly affect his communication and social interaction, was seven years old and had already been enrolled in several different schools. His teachers were concerned his lack of stability was hampering his ability to make progress on his individualized education plan, but Mother was convinced T.N.'s teachers were not doing enough to assist and protect him. She kept T.N. home from school some days, and on the morning of May 2, 2024, she sent the principal at T.N.'s school a rambling email that was so bizarre the principal called the police.[3]

That led to a welfare check at Mother's apartment later that day. During the check, officers noticed the apartment was dirty and unkempt. And when they questioned Mother about T.N., her responses were incoherent and paranoid. The officers ended up taking Mother into custody pursuant to Welfare and Institutions Code section 5150, which authorizes a temporary hold to permit a psychological evaluation of people who are considered a danger to themselves or others.[4] T.N. was taken to a children's home for his protection.

A few days later, respondent Orange County Social Services Agency (OCSSA) filed a child welfare petition alleging Mother and Father had failed to protect and support T.N. (§ 300, subds. (b), (g).) At the detention hearing on May 7, 2024, the juvenile court determined there was sufficient

---

[3] Among other things, Mother alleged in the email that someone was hanging dirty laundry on the trees outside of T.N.'s classroom.

[4] All further statutory references are to the Welfare and Institutions Code, unless otherwise stated.

cause to keep T.N. at the children's home. It also ordered OCSSA to provide reunification services for Mother and Father.

## II.

### PROGRESS ON SERVICE PLANS

Over the next five months leading up to the October 2024 jurisdiction hearing, T.N.'s parents had varying degrees of success on their respective reunification plans. Mother was resistant to therapy and drug-tested only irregularly. She also accused OCSSA of mishandling her case and continued to make unfounded allegations against her family and others. When told T.N. was going to be placed with his maternal aunt (M.A.) in Hemet, Mother objected on the basis M.A. and her husband had sexually abused T.N. Finding no truth to that allegation, OCSSA placed T.N. in M.A.'s care on July 1, 2024.

T.N. adjusted well to this placement and has been attending a new school that serves his special education needs. Although he reported he misses Mother, he did not have good things to say about Father. When interviewed by the social worker, T.N. claimed Father was a "bad guy" who had touched his "'wiener'" and "'butt.'" But T.N. had no memory of that actually happening; he was merely repeating what Mother had told him. He also said Mother had told him Father was dead. As it turned out, the authorities found no evidence Father had physically or sexually abused T.N.

At the outset of his service plan, Father told his social worker he wanted to reconnect with T.N. and have T.N. placed with him in South Carolina. As the case progressed, however, Father struggled to keep up with his plan. Despite having a past opioid addiction and current mental health issues (PTSD and social anxiety), Father was reluctant to enroll in the drug testing program, mental health services, and parenting classes that were

5

recommended to him by his social worker. Father felt those services were largely unnecessary because he was already undergoing therapy and drug testing through his own provider in South Carolina. His social worker was concerned, however, because Father's drug testing program in South Carolina did not call for random testing. When Father finally enrolled in an approved testing program, he failed to show up for all but one of his tests, and the one test he did complete came back positive for marijuana.

Father also was slow to initiate phone call visits with T.N. Blaming his busy schedule, health issues, and communication problems with T.N.'s caretaker M.A., Father missed both of his scheduled calls in July 2024. In August, Father threatened to stop participating in his service plan altogether, unless M.A. was more accommodating of his schedule.

Father was particularly concerned about scheduling the calls with T.N. around his work schedule. Despite repeated requests, however, he did not always inform M.A. of his work schedule in a timely fashion. Consequently, his first phone visit with T.N. did not take place until September 4, 2024, four months after T.N. was detained. The visit went well, and T.N. was happy to learn he had a father, but Father did not follow up on the call. Even though he was authorized to have twice-weekly phone visits with T.N., the next one did not occur until September 27. And in the wake of that visit, Father was not receptive to the social worker's requests for an update on his service plan.

### III.

#### THE JURISDICTION HEARING

Following several continuances, one of which was due to Mother's recent pregnancy, the jurisdiction hearing finally began on October 21, 2024. At the hearing, Mother denied most of the allegations that had been leveled

against her. Although she admitted she had experienced mental health issues in the past, she claimed they were sufficiently resolved to allow her to regain custody of T.N. Mother also expressed great displeasure to the court about the way her case was being handled. Insisting that OCSSA had abused her, lied to her, and prevented her from telling her side of the story, she threatened to report her case workers to the FBI. That was right before she told the judge she was going to have a "fucking seizure" and abruptly left the courtroom.

Father testified via Zoom from South Carolina. He admitted he was not present at T.N.'s birth and has not been actively involved in his life. However, he said that was because Mother fled with T.N. and he did not know where they were living. Now that this case has come up, he wants to make up for lost time and have T.N. placed with him as soon as possible.

Speaking to his ability to care for T.N., Father said that, like T.N., he had a speech impediment while growing up, so he could relate to T.N.'s situation and help him overcome his speech issues. Father also said there is a school for autistic children close to his home that would be a good fit for T.N. if he came to live with him in South Carolina.

Although he works long hours, Father said his employer would be flexible if he needed to change his schedule to care for T.N. Father also maintained he has a good support system of people who could help him look after T.N., including his adult son from a previous relationship who currently lives with him, as well as other relatives and friends.

Father testified he went through a rough patch in 2015–2016 while caring for his elderly parents before they died and said he still suffers from PTSD and anxiety from that experience. But he has managed to get those issues under control with the help of counseling. Father also sustained

severe neck and back injuries in a car accident around that time, and during his rehabilitation, he became addicted to opioids that were prescribed to relieve his pain. However, he said he was able to overcome his addiction by completing a 12-step program and using the prescription drug Suboxone, which he still takes on a regular basis.

As a condition of his Suboxone prescription, Father has had to drug test regularly. He said he has tested clean the last four years, and the only reason he tested positive for marijuana during his service plan in this case is because he took a gummy supplement not knowing it contained THC. In addition to continuing his drug testing, Father said he would be willing to enroll in parenting classes and partake in any other services his social worker recommended, so long as he could do them online and they were not too expensive.[5]

Regarding visitation, Father testified he has had about five to seven phone calls with T.N. since this case began, and their conversations have been "going great." In addition, his adult son has talked to T.N. and is excited about the prospect of connecting with his half-brother. Father admitted, however, he had not talked to T.N. much in the weeks leading up to the jurisdiction hearing. He said that was because he had been working a lot, his adult son had been in the hospital, and the time difference between California and South Carolina was difficult to navigate.

Father also blamed his social worker and M.A. for not doing more to facilitate visitation between him and T.N. To prove he was doing as much as he could on his end, Father produced numerous text messages between

---

[5] Father told the social worker he only makes enough money from his job as a deli clerk to live paycheck to paycheck.

8

him, M.A., and the social worker. The messages show M.A. and the social worker reached out to Father on numerous occasions to assist him with visitation and other aspects of his service plan. They also show that, despite some delays and grumbling on Father's part, he generally was receptive to these efforts. But despite the good intentions of everyone involved, Father was having a difficult time squeezing T.N. into his hectic life.

Testifying on behalf of OCSSA, the social worker acknowledged that Mother and Father miss T.N. and want to reunite with him. Nevertheless, the social worker did not believe it would be in T.N.'s best interest to be placed in their care at this time because T.N. has been through a lot, he is currently in a secure placement, and he is receiving all the services he needs to meet his needs, including therapy and special education. Among other things, the social worker cited Mother's mental health issues and ongoing concerns about Mother's potential substance abuse as reasons for not returning T.N. to her care. Indeed, the social worker believed Mother needed to make much more progress on her service plan before she could be trusted to care for T.N. on her own.

With respect to Father, the social worker was worried T.N. did not have a foundational relationship with him. She said children need "safe consistency" in their lives, and moving T.N. across the country to live with Father and other people he hardly knows would undermine that goal, especially because T.N. has special needs and has been doing well in his current placement.

Moreover, the social worker said that, despite her many efforts, she had been having difficulty communicating with Father and had been unable to assess his home or confirm he could meet all of T.N.'s needs. She has reached out to Father on numerous occasions but has only spoken to him

9

on one occasion. And although they have texted back and forth multiple times, she did not hear from Father at all in the weeks leading up to the jurisdiction hearing. Father blamed this on his busy and ever-changing work schedule, but the social worker was concerned about his lack of basic communication with her.

The social worker also expressed concern about Father's phone visits with T.N., but it wasn't the substance of the calls that troubled her; rather, she was worried the visits were too inconsistent and infrequent. Whereas Father claimed he had talked to T.N. up to seven times over the course of the case, the social worker put the number closer to four. The social worker also said she would like to see Father participating in parenting classes and complying with random drug testing before T.N. could be placed in his care.

IV.

THE JUVENILE COURT'S RULINGS

Based on this record, the juvenile court determined there was sufficient evidence to sustain the allegations that Mother and Father had failed to protect and support T.N. The court therefore declared T.N. a dependent of the court.

The court then heard arguments on the issue of placement. Counsel for OCSSA asserted it would be premature to return T.N. to the care of Mother or Father at this time. While recognizing that might be an option at some point in the future, counsel argued Mother was currently unfit to care for T.N. and it would be "detrimental to [T.N.'s] emotional well-being to release him to [Father] right away, given that there's been [an] absence in the last couple of years, minimal phone calls and contact." Accordingly, OCSSA's attorney urged the court to "find by clear and convincing evidence

10

that return[ing T.N.] to either parent would be contrary to [T.N.'s] best interest and there's a substantial danger to his physical and emotional well-being if he were returned home today."

In so arguing, OCSSA's attorney did not bring up the fact that Mother had custody of T.N. at the time he was detained, while Father was a noncustodial parent. But T.N.'s attorney did. She correctly pointed out that, because Mother was the custodial parent when T.N. was detained, her request to have T.N. returned to her care was governed by section 361, while Father's request for custody was governed by section 361.2 because he was the noncustodial parent when this case arose. (Both statutes are discussed more fully below.)

Citing the "unique circumstances of this case," T.N.'s attorney also reminded the court T.N. has special needs due to his autism and speech delay and he had just become stabilized in his current placement with M.A.'s family. Counsel contended, "To disrupt that again and to have [T.N.] restart all of that in a new environment with people he . . . is not currently familiar with . . . would be extremely detrimental to his emotional and mental well-being." T.N.'s counsel also voiced concerns about Father's ability to protect and provide for T.N. if the child were returned to his care.

In response to these remarks, Father's attorney argued there was insufficient evidence to justify keeping T.N. in his current placement, and T.N. should be placed in Father's care. Counsel's argument was based on his belief Father was making a good-faith effort on visitation and other aspects of his case plan. He also relied on the fact Father was not the "offending" parent, meaning he was "not the reason as to why this case was brought up."

After hearing from all the parties, the juvenile court ruled, "The welfare of the child requires that custody be taken from the parents and

vested with the Social Services Director for suitable placement." In conjunction with that ruling, the court found "by clear and convincing evidence that [section] 361[, subdivision] (c)(1) and (5) appl[y] and to vest custody with parents would be detrimental to the child . . . ."

Although the juvenile court denied Mother's and Father's requests to have T.N. placed in their custody, it did authorize continued reunification services and visitation for both. Citing Mother's "significant" mental health issues, however, the court ordered her to undergo a psychological examination pursuant to Evidence Code section 730 as part of her service plan. A six-month review hearing was scheduled for April 7, 2025.

## DISCUSSION

### I.

#### FATHER'S APPEAL

Father's appeal is limited to the juvenile court's disposition order. He contends the court prejudicially erred by failing to expressly consider his status as a noncustodial parent when making its order. OCSSA concedes the court erred in this regard. However, it maintains Father forfeited his right to raise this issue on appeal, and, in any event, the error was harmless. We find OCSSA's forfeiture argument unavailing, but we agree the court's error was not prejudicial.

As set forth above, the juvenile court cited section 361, subdivision (c) in making its disposition ruling. As relevant here, that provision provides, "A dependent child shall not be taken from the physical custody of their parents . . . with whom the child resides at the time the petition was initiated, unless the juvenile court finds clear and convincing evidence" (*ibid.*) there "would be a substantial danger to the physical health, safety, protection, or physical or emotional well-being of the minor if the

12

minor were returned home" (*id.*, subd. (c)(1)) or the child "has been left without any provision for their support (*id.*, subd. (c)(5)).

By its terms, section 361, subdivision (c) governs the removal of a dependent child from a *custodial* parent, which in this case was Mother. Once removal is ordered under section 361, section 361.2 then applies to placement with a *noncustodial* parent, which in this case was Father. Section 361.2 states in pertinent part: "If a court orders removal of a child pursuant to Section 361, the court shall first determine whether there is a parent of the child, with whom the child was not residing at the time that the events or conditions arose that brought the child within the provisions of Section 300, who desires to assume custody of the child. If that parent requests custody, the court shall place the child with the parent unless it finds that placement with that parent would be detrimental to the safety, protection, or physical or emotional well-being of the child." (§ 361.2, subd. (a).)

OCSSA concedes the juvenile court did not expressly apply section 361.2 as to Father, even though he was seeking custody of T.N. as a noncustodial parent. Nevertheless, OCSSA argues Father forfeited his right to raise this issue on appeal because he did not object on that basis when the juvenile court issued its ruling. We do not agree.

Generally, a party who fails to raise an issue in the trial court is deemed to have forfeited the issue for purposes of appeal. (*In re Lorenzo C.* (1997) 54 Cal.App.4th 1330, 1338.) The rule is designed to encourage parties to bring errors to the attention of the trial court so they may be corrected. (*In re Sheena K.* (2007) 40 Cal.4th 875, 880–881.) The rule also guards against gamesmanship because it would be unfair to both the trial court and opposing counsel to allow a party to take advantage, on appeal, of an alleged error that could have been addressed and/or corrected when it was originally

13

made in the lower court. (*In re M.H.* (2016) 1 Cal.App.5th 699, 713–714; *In re Dakota S.* (2000) 85 Cal.App.4th 494, 501.)

Here, however, those fairness concerns do not come into play because, although Father failed to apprise the juvenile court section 361.2 was the controlling statute for purposes of assessing his custody request, T.N.'s attorney made that point clear in her argument. Quoting directly from the statute, she properly recognized that, as a noncustodial parent seeking custody, Father was entitled to have T.N. placed with him unless it would be detrimental to T.N.'s safety or emotional well-being. Because this alerted both OCSSA's counsel and the juvenile court to the proper standard for adjudicating Father's placement request, the purpose of the forfeiture rule would not be advanced by applying it here. We therefore turn to the merits of Father's argument.

As set forth above, section 361.2 requires a dependent child to be placed with a noncustodial parent unless the agency can show such placement would be detrimental to the child's well-being. By creating a presumption in favor of placement with a noncustodial parent, the statute "furthers the legislative goals to . . . place a child in the care of a parent when safe for the child, strengthen the child's relationship with siblings and other relatives, and avoid the child's placement in foster care." (*In re Nickolas T.* (2013) 217 Cal.App.4th 1492, 1505–1506.) Moreover, "[t]o comport with due process, the detriment finding must be made under the clear and convincing evidence standard." (*In re C.M.* (2014) 232 Cal.App.4th 1394, 1401.)

It is undisputed the juvenile court erred by failing to expressly apply section 361.2 as to Father. Nevertheless, "'[w]e cannot reverse the court's judgment unless its error was prejudicial, i.e., "'it is reasonably probable that a result more favorable to the appealing party would have been

14

reached in the absence of the error.""" (*In re D'Anthony D.* (2014) 230 Cal.App.4th 292, 303; *In re J.S.* (2011) 196 Cal.App.4th 1069, 1078–1079.) For several reasons it is not reasonably probable Father would have obtained a more favorable result absent the error.

First, despite not expressly referencing section 361.2 in its disposition ruling, the juvenile court found by "clear and convincing evidence" that "vest[ing] custody with *parents* would be detrimental to the child." (Italics added.) This shows the court had serious concerns about placing T.N. with either Mother *or* Father and that, even though the court cited section 361 and not 361.2 in its ruling, it ultimately applied the proper legal standard in evaluating Father's request for custody of T.N. (See *In re D'Anthony D., supra,* 230 Cal.App.4th at p. 303 [juvenile court's findings under section 361 demonstrated the court's failure to apply section 361.2 was harmless error].)

Second, reviewing the record as a whole, there is substantial evidence that placing T.N. with Father in South Carolina would be detrimental to T.N.'s emotional well-being, as contemplated by section 361.2, subdivision (a). T.N. has had very little contact with Father during his lifetime. In fact, T.N. did not even know he had a dad until he spoke with Father over the phone in connection with this case. Granted, that was more Mother's fault than Father's. And by itself, the lack of contact would be insufficient to deny Father's request to have T.N. placed in his care. (*In re K.B.* (2015) 239 Cal.App.4th 972, 981.) However, the lack of any meaningful bond between Father and T.N. is a factor supporting the juvenile court's finding that it would be detrimental for T.N. to be placed with Father. (See *In re A.C.* (2020) 54 Cal.App.5th 38, 43.)

15

One of the ways Father could have tried to start bonding with T.N. is by having consistent phone contact with him during the pendency of this case. In the months leading up to the jurisdiction hearing, though, Father's phone contact with T.N. was minimal and inconsistent. Father blamed that on his busy work schedule, among other things. But he also testified his employer would be flexible in allowing him to modify his schedule to accommodate T.N.'s needs. Apparently, Father never asked his employer to change his schedule to facilitate phone visits with T.N., or his requests were denied. Either way, the lack of phone contact between Father and T.N. was a troubling sign in terms of Father's ability (or willingness) to make T.N. a priority in his life.

During his testimony, Father blamed T.N.'s caregiver M.A. and the social worker for not doing more to facilitate phone contact between him and T.N. Yet the record shows M.A. and the social worker repeatedly tried to work with Father on this issue. But despite all their efforts, Father's busy work schedule and other circumstances in his life prevented him from having greater phone contact with T.N. and forging a meaningful bond with T.N.

Father also dragged his feet when it came to signing up for the parenting classes and the random drug testing program that were recommended to him by the social worker. And when he finally did submit to random testing, he immediately tested positive for marijuana. By his own admission, Father also has PTSD and anxiety, which may complicate his ability to meet T.N.'s special needs. And his communication with the social worker has been so spotty that she has not even been able to assess his South Carolina home to determine whether it would be suitable for T.N.

Faced with all these issues, the juvenile court was rightly concerned about removing T.N. from his current placement with M.A. and

her family at this juncture. Even if the court had expressly applied section 361.2 in making its disposition ruling, it is not reasonably probable Father would have prevailed on his request to have T.N. placed in his custody. Therefore, the court's failure to do so was harmless error, and there is no basis to disturb its ruling.

## II.

### MOTHER'S APPEAL

Mother's notice of appeal identified the juvenile court's jurisdiction and disposition orders as the focus of her appeal. She also challenged the court's order requiring her to undergo a psychological evaluation under Evidence Code section 730. As noted at the outset, however, Mother's appellate attorney filed a brief stating he was unable to find any issues to raise on Mother's behalf. Mother's counsel asks us to independently review the record for potential error and offer Mother the opportunity to personally file a supplemental brief. But Mother does not have a right to such review, and good cause for supplemental briefing has not been shown. (See *In re Sade C.* (1996) 13 Cal.4th 952, 959; *In re Phoenix H.* (2009) 47 Cal.4th 835, 844–846.) Accordingly, we deny counsel's requests and dismiss Mother's appeal.

## DISPOSITION

Mother's appeal of the juvenile court's orders is dismissed. The juvenile court's disposition order is affirmed.


GOODING, J.

WE CONCUR:


MOORE, ACTING P. J.


MOTOIKE, J.